No. DA 06-0634

IN THE SUPREME COURT OF THE STATE OF MONTANA

2006 MT 277

MONTANANS FOR JUSTICE: VOTE NO
ON CI-98; NOT IN MONTANA: CITIZENS
AGAINST CI-97; AND PROPERTY OWNERS
AGAINST I-154, Political Ballot Committees,

        Plaintiffs and Respondents,

    v.

STATE OF MONTANA, by and through MIKE
MCGRATH, in his capacity as the Attorney
General; and BRAD JOHNSON, in his capacity
as Secretary of State,

        Defendants and Respondents,

MONTANANS IN ACTION, a Montana
Corporation; CITIZENS RIGHT TO RECALL
MONTANA; PROTECT OUR HOMES
MONTANA; STOP OVER SPENDING MONTANA,
Political Ballot Committees, and TREVIS BUTCHER,

        Defendants and Appellants,

        and

KENDALL COX, ERVIN J. HANKS, and
ROBERT J. COOPER, Individually,

        Intervenors.

APPEAL FROM:    The District Court of the Eighth Judicial District,
               In and For the County of Cascade, Cause No. CDV 06-1162 (d)
               Honorable Dirk M. Sandefur, Presiding Judge

COUNSEL OF RECORD:

    For Defendants and Appellants:

        Christopher John Gallus, Attorney at Law, Helena, Montana

For Intervenors:

> Patrick R. Watt, Jardine, Stephenson, Blewett & Weaver,
> Great Falls, Montana

For Plaintiffs and Respondents:

> Peter Michael Meloy and Robin A. Meguire, Meloy Trieweiler,
> Helena, Montana

For Defendants and Respondents:

> Hon. Mike McGrath, Attorney General, Anthony Johnstone,
> Assistant Attorney General, Pamela D. Bucy, Assistant Attorney
> General, Janice Doggett, Legal Counsel, Helena, Montana

Submitted on Briefs:  October 5, 2006

Decided:  October 26, 2006

Filed:

_____
Clerk

Justice Patricia O. Cotter delivered the Opinion of the Court.

¶1     Plaintiffs Montanans For Justice: Vote No On CI-98, Not In Montana: Citizens Against CI-97, and Property Owners Against I-154 (collectively "Opponents") comprise three political ballot committees who brought suit against the three Defendant political ballot committees: Citizens Right To Recall Montana, Protect Our Homes Montana, and Stop Over Spending Montana.  Opponents also sued Trevis Butcher, the treasurer of the Defendant political ballot committees, and Montanans in Action, a Montana corporation for which Butcher is executive director.  Defendant political ballot committees, Montanans in Action, and Trevis Butcher will be referred to collectively as "Proponents." Additionally, Opponents sued the State of Montana through Attorney General Mike McGrath and Secretary of State Brad Johnson (hereinafter "the State").

¶2     Opponents brought this action in the Montana Eighth Judicial District Court, Cascade County, alleging that Proponents, in their attempt to get two constitutional initiatives and one statutory initiative on the ballot for November 2006, engaged in signature gathering practices that violated applicable state law.  After an expedited hearing, the District Court held that the signature gathering process was permeated by fraud and procedural non-compliance.  The court invalidated the signatures obtained by specific signature gatherers, and invalidated the Secretary of State's certifications of CI-97, CI-98, and I-154.  Proponents appeal.  We affirm.

**ISSUES**

¶3     Proponents raise three issues on appeal.  A restatement of those issues is:

¶4     1.     Was Opponents' claim barred by laches?

¶5     2.     Did the District Court violate Proponents' due process rights when it expedited the hearing and denied more time for discovery?

¶6     3.     Did the District Court err when it determined that the signature gathering process was permeated by a pervasive and general pattern and practice of fraud and procedural non-compliance?

**FACTUAL AND PROCEDURAL BACKGROUND**

¶7     This case involves an attempt by Proponents to place two constitutional initiatives and one statutory initiative on the November 2006 ballot.  CI-97 is a proposed constitutional initiative imposing limits on the spending and taxation authority of the State of Montana.  CI-98 is a proposed constitutional initiative revising the process for removing judges and justices from office.  I-154 is a proposed statutory initiative revising the legal definition of a government "taking" as it relates to property ownership and eminent domain.

¶8     Proponent committees were formed for the purpose of promoting these initiatives, while Opponent committees were formed once the promotion began, in order to oppose them.

¶9     Montana citizens have the constitutional right to enact laws by initiative.  Mont. Const. art. III, § 4.  The Legislature has established specific procedural requirements to safeguard the integrity and fairness of the initiative process.  See §§ 13-27-101 through

-504, MCA. One such requirement is that proponents of an initiative, whether statutory or constitutional, must gather a specific percentage of voter signatures to qualify their initiative for the ballot. Sections 13-27-204 and -207[1], MCA. Currently, under these statutes, to qualify a statutory initiative, 22,308 signatures from 34 legislative districts must be gathered. To qualify a constitutional initiative for the ballot, a petitioner must gather 44,615 signatures from 40 legislative districts.

¶10 A "signature gatherer" is defined as "an individual who collects signatures on a petition for the purpose of an initiative, a referendum, or the calling of a constitutional convention." Section 13-27-111(4), MCA (as amended, 2003). Such signature gatherers must submit a standard form affidavit attesting that: (1) he or she "gathered or assisted in gathering" the signatures on the petition; and (2) he or she believes the signatures on the petition are those of genuine Montana voters living at the addresses entered by the petition signer; and that "the signers knew the contents of the petition before signing the petition."[2] Section 13-27-302, MCA.

¶11 Proponents began collecting signatures throughout the state of Montana in March 2006 and collected them until June 23, 2006, the date on which all gathered signatures had to be submitted to county election administrators for certification. Proponents utilized some Montana citizens to collect signatures but relied primarily on paid out-of-

---

[1]Section 13-27-207, MCA (2005), was revised by federal district court order in *Montana Public Interest Research Group v. Johnson,* 361 F.Supp.2d 1222 (Mont. 2005), to require that 10% of the signatures be gathered from 40 legislative districts rather than half of the counties.

[2] While we conclude later in this Opinion that some persons hired by Proponents to collect signatures do not satisfy the statutory definition of "signature gatherer," we use the term "signature gatherer" throughout this Opinion to denote those persons who meet this definition as well as those who purport to meet it.

state signature gatherers to obtain the overwhelming majority of the signatures submitted. The uncontradicted evidence established that Proponents paid over $633,000.00 to out-of-state signature gatherers who collected signatures for these three initiatives. Individual signature gatherers were paid between fifty-cents and $2.50 per signature per initiative.

¶12 Proponents submitted their signed petitions to the county election administrators, who in turn certified them and submitted them to the Secretary of State's office. The Secretary of State ultimately certified 47,905 signatures for CI-97, 49,956 signatures for CI-98, and 27,748 signatures for I-154. Because each initiative garnered more than the required number of signatures (see ¶ 9), these ballot initiatives were certified to the Governor on or around July 21, 2006.

¶13 On August 16, 2006, Opponents filed their Complaint alleging that Proponents' signature gatherers violated the statutory requirements governing ballot issue petitions by obtaining signatures in a deceptive manner and by falsely swearing to the contents on the signature gatherers' form affidavits. On August 24, 2006, the Secretary of State's office certified ballots containing all three ballot initiatives back to the county election administrators for preparation and printing of ballots for the elections. Also on August 24, Opponents moved for an expedited hearing on their Complaint. On August 28, 2006, the District Court granted the motion to expedite, and set the hearing for September 8, 2006. In this Order, the court also instructed Opponents to properly serve Proponents with the Complaint. The Proponents were served with the Complaint that same day.[3]

---

[3] The record does not reflect the reason that Proponents were not served earlier.

¶14 The State accepted service of the Complaint on August 17, 2006. It filed its Answer to the Complaint on August 30, 2006, but took no position as to the truth of the allegations raised by the Opponents. The case was assigned to the Honorable Kenneth R. Neill of the Montana Eighth Judicial District. Pursuant to notice, Judge Neill held a conference on the record on September 5, 2006, which counsel for all parties attended either in person or by telephone.

¶15 During the conference, the court and the parties settled upon the date and time for perpetuation depositions of three of Opponents' witnesses. Also, the court inquired whether any of the parties had a problem with the scheduled hearing date. Proponents' attorney stated, "We do have some problems, not so much with the date, although we would like to see it moved so that we would have more time for some discovery." However, due to the District Court's schedule and the urgency to resolve this case at the earliest date before the November election, the District Court denied Proponents' suggestion that the hearing be moved. The court concluded its conference by requesting that the parties submit proposed findings of fact and conclusions of law. Opponents submitted both a pre-hearing brief and their proposed findings and conclusions on September 8, 2006. Proponents declined to submit either. Moreover, Proponents did not file an Answer to Opponents' Complaint, nor did they file any pre-trial motions for discovery or extension of time.

¶16 On September 7, 2006, the day before the scheduled hearing, counsel for the Proponents filed a one-sentence motion for substitution of judge. As a result, Judge Neill

7

requested that Honorable Dirk Sandefur assume jurisdiction. Judge Sandefur accepted jurisdiction on September 8, 2006.

¶17 The case proceeded to trial on September 8, 2006, before Judge Sandefur, sitting without a jury. Before trial began, Intervenors Cox, Hanks and Cooper appeared by counsel and requested leave to intervene in the proceedings. Their motion was granted without objection. Trial then commenced. Opponents called three witnesses to testify in person. They also presented three perpetuation depositions, as well as excerpts from the testimony of a signature gatherer given at a hearing before the Oklahoma Supreme Court. The State called two witnesses, and two of the Intervenors testified on their own behalf. The Proponents called one witness, Trevis Butcher. At the close of the one-day trial, Judge Sandefur took the matter under advisement. On September 13, 2006, the court issued its Findings of Fact, Conclusions of Law, and Order Invalidating Certification of CI-97, CI-98, and I-154. Proponents filed a timely appeal.

¶18 We note that while Intervenors participated in the hearing and co-signed Appellants'/Proponents' Brief filed with this Court, they did not file a notice of appeal. The only such notice was filed by Proponents. M. R. App. P. 4(b), provides that if two or more parties desire to appeal from a district court judgment, they may either file a joint notice of appeal, or may join together after filing separate timely notices of appeal. As Intervenors did neither, they are not parties to this appeal.

## STANDARD OF REVIEW

¶19 Proponents argue that the District Court's findings are not supported by the evidence and that the court incorrectly interpreted and applied the applicable law. We

review a district court's findings of fact to determine whether they are clearly erroneous. A finding is clearly erroneous if it is not supported by substantial evidence, if the court misapprehended the effect of the evidence, or if our review of the record convinces us that the court made a mistake. *Petitioners I-549 v. Missoula Irrigation*, 2005 MT 100, ¶ 8, 326 Mont. 527, ¶ 8, 111 P.3d 664, ¶ 8 (internal citations omitted).

¶20 We review a district court's conclusions of law to determine whether its interpretation of the law is correct. *Petitioners I-549*, ¶ 9.

## DISCUSSION

*ISSUE ONE*

¶21 *Was Opponents' claim barred by laches?*

¶22 The first issue before us is whether the Opponents' claim was barred by laches. Proponents maintain that Opponents knew they would be challenging the initiative signature gathering process in the weeks before they filed suit, but negligently delayed asserting their rights until August 16, 2006. They claim that the doctrine of laches should be applied so as to bar Opponents' challenge to the ballot certification.

¶23 Laches is an equitable doctrine by which a court denies relief to a claimant who has unreasonably delayed or been negligent in asserting the claim, when the delay or negligence has prejudiced the party against whom relief is sought. *Black's Law Dictionary* 879 (Bryan A. Garner ed., 7th ed., West 1999). See also *Cole v. State ex rel. Brown*, 2002 MT 32, ¶ 24, 308 Mont. 265, ¶ 24, 42 P.3d 760, ¶ 24.

¶24 Proponents' laches' argument is flawed for two reasons. First, laches is an affirmative defense. As such, under M. R. Civ. P. 8:(c), Proponents were required to

9

raise it in their Answer to the Opponents' Complaint in District Court. Rule 8(c) states in relevant part, "In pleading to a preceding pleading, a party shall set forth affirmatively . . . laches . . . and any other matter constituting an avoidance or affirmative defense." However, Proponents did not file an Answer to the Opponents' Complaint. We have held previously that a defense of laches, not raised in the answer, cannot be raised for the first time on appeal. *Deist v. Wachholz*, 208 Mont. 207, 227, 678 P.2d 188, 198 (1984). We note further that at no time during the District Court proceedings did Proponents argue that Opponents' claim was barred by laches.

¶25 Even if Proponents' laches argument was not procedurally barred, the doctrine simply does not apply here. The doctrine of laches applies where there has been such delay as to render enforcement of the asserted right inequitable. *In re Marriage of Deist*, 2003 MT 263, ¶ 17, 317 Mont. 427, ¶ 17, 77 P.3d 525, ¶ 17. In *Castillo v. Franks*, 213 Mont. 232, 690 P.2d 425 (1984), we said that "[t]he purpose of laches is to discourage stale demands by the court refusing to interfere where there has been gross laches in prosecuting rights, or where long acquiescence in assertion of adverse rights has occurred." *Castillo*, 213 Mont. at 241, 690 P.2d at 429. Thus, the doctrine is aimed at foreclosing "stale" claims, or those asserted after a protracted period of seeming assent. *Accord Cole, ¶* 24 (Plaintiffs' claim, brought nine years after the term limits initiative, CI-64, became effective and presumptively valid, was barred by laches.). Here, it is undisputed that Opponents brought their claim within thirty (30) days after the ballot issues were certified, as required by § 3-5-302(6), MCA. In light of the fact that they complied with the statute's narrow 30-day window for filing suit, it cannot reasonably be

argued that Opponents waited until their claims had grown stale before asserting them. Therefore, we conclude that Opponents' claims are not barred by the equitable doctrine of laches.

*ISSUE TWO*

¶26     *Did the District Court violate Proponents' due process rights when it expedited the hearing and denied more time for discovery?*

¶27     Proponents contend the District Court violated their due process rights because the court denied Proponents' "motion to delay trial to allow for discovery." As a result, Proponents claim they were "unable to conduct meaningful investigation or any discovery and were not on notice of many of the claims and evidence presented at the hearing." This, they argue, subjected them to "trial by ambush."

¶28     Opponents invite us to ignore the due process claim because Proponents raised it for the first time on appeal. We agree the record contains neither a motion for a continuance, nor a memorandum or affidavit(s) articulating what discovery Proponents would have conducted had the court allowed more time. Rather, Proponents premise their contention that they preserved this claim for appeal purposes solely on counsel's response to the District Court's inquiry during the September 5, 2006 scheduling conference about the date set for trial. In response to the court's question, Proponents commented, "We do have some problems, not so much with the date, although we would like to see it moved so that we would have more time for some discovery." A protracted discussion followed regarding the scheduling of three perpetuation depositions. Opponents scheduled the depositions at a time Proponents' counsel requested, but then

11

during the scheduling conference, Proponents' counsel said he "prefer[red] certainly another time." Notwithstanding Proponents' failure to move to continue the hearing date, the court considered the comments regarding postponement, but declined to accept them, saying, "I think the time constraints are such that we need to have this on [September 8, 2006.]" Because the District Court arguably construed Proponents' comments disfavoring the September 8, 2006 trial date as a request to postpone the hearing, we will address the merits of Proponents' due process claim.

¶29 We therefore turn to the question of whether the court's denial of more time impinged Proponents' due process rights. The Fourteenth Amendment to the United States Constitution and the Montana Constitution at Article II, § 17, provide that no person shall be deprived of life, liberty, or property without due process of law. The guarantee of due process has both a procedural and a substantive component. *Elgin v. Board of County Com'rs*, 2002 MT 115, ¶ 14, 310 Mont. 1, ¶ 14, 48 P.3d 39, ¶ 14. Generally, substantive due process analysis applies when state action is alleged to unreasonably restrict an individual's constitutional rights. *See Elgin*, 2002 MT 115, 310 Mont. 1, 48 P.3d 39, and *Newville v. State Dept. of Family Services*, 267 Mont. 237, 883 P.2d 793 (1994). Here, Proponents contend the District Court's denial of their motion to delay trial left them with inadequate time to prepare their case. Proponents' complaint is procedural in nature, and therefore constitutes a procedural due process claim.

¶30 Under both federal and state jurisprudence the requirements for procedural due process are (1) notice, and (2) opportunity for a hearing appropriate to the nature of the case. *See Jones v. Flowers*, ___ U.S. ___, 126 S.Ct. 1708, 1712, and *Matter of Klos*, 284

12

Mont. 197, 205, 943 P.2d 1277, 1281, both citing *Mullane v. Central Hanover Tr. Co.,* 339 U.S. 306, 313, 70 S.Ct. 652, 656-57 (1950). As such, "the process due in any given case varies according to the factual circumstances of the case, the nature of the interests at stake and the risk of making an erroneous decision." *McDermott v. McDonald*, 2001 MT 89, ¶ 10, 305 Mont. 166, ¶ 10, 24 P.3d 200, ¶ 10 (citation omitted). Otherwise stated, due process requirements of notice and a meaningful hearing are "flexible" and are adapted by the courts to meet the procedural protections demanded by the specific situation. *Geil v. Missoula Irr. Dist.*, 2002 MT 269, ¶ 58, 312 Mont. 320, ¶ 58, 59 P.3d 398, ¶ 58 (citation omitted).

¶31 Both Montana law and the truncated timeline available for resolving preelection initiative challenges require relatively rapid action by the parties and the courts between the time an initiative qualifies for the ballot—typically in mid-July—and the date on which voters cast ballots in the first week of November. Allegations of deceptive election practices must therefore be raised, proven, and if necessary remedied, within a narrow window of time. A person or group challenging the validity of a qualified ballot initiative must file suit within 30 days of the date the initiative is certified. Section 3-5-302(6), MCA. Thereafter, "[a] preelection challenge to the procedure by which an initiative or referendum qualified for the ballot . . . shall be given priority by the courts." Mont. Const. art. IV, § 7(2). Moreover, "[t]he sufficiency of the initiative petition shall not be questioned after the election is held." Mont. Const. art. III, § 4(3). In sum, the law requires that challenges to an initiative be raised, addressed, and resolved in accelerated

13

fashion. Against this backdrop, we consider Proponents' objections concerning notice and the expedited hearing.

**Notice**

¶32 Proponents' sole claim regarding the District Court's failure to meet the due process notice requirement centers upon their contention that they had "no notice" Opponents would offer evidence regarding "fraudulent addresses by over 40 signature gatherers." We cannot agree. Opponents' Complaint, in a section entitled "Defendants Engaged in a Statewide Pattern of Deceptive Practices in the Gathering of Signatures," clearly alleged that "professional signature gatherers were encouraged to lie and generally engage in a pattern of devious and deceptive practices, including *routinely providing false addresses on affidavits* . . . ." (Emphasis added.) However, Proponents contend that without the additional benefit of a pre-trial order and full discovery they "were primed for a surprise attack" when Opponents contested the validity of "over 40 of the signature gatherers' addresses as a basis to prove pervasive fraud."

¶33 We conclude that Opponents' Complaint was sufficiently specific to put Proponents on notice that Opponents contested the validity of addresses listed by paid signature gatherers on affidavits filed with county election officials. Further, Proponents' witness, Butcher, acknowledged under oath that the Secretary of State's Elections Specialist phoned him during the signature gathering cycle, occurring between March and July, to notify Butcher of complaints received related to address falsification on paid signature gatherers' affidavits. Therefore, Proponents were aware that the addresses of the signature gatherers would be an issue in advance of the hearing.

14

¶34   It is most significant, however, that these signature gatherers were contacted, hired and paid by Proponents. Thus, any information as to their true addresses was within the exclusive knowledge of Proponents, and not Opponents. Proponents do not explain how, under these circumstances, discovery from Opponents regarding signature gatherers' addresses would have been of any assistance whatsoever. We therefore must reject the contention that Proponents were prejudiced by the denial of a longer period of notice or discovery regarding the addresses of their own paid signature gatherers.

¶35   Proponents raise no other contentions regarding notice. We therefore turn to the bulk of Proponents' argument in which they protest the condensed timeframe for pre-trial discovery as an unconstitutional restriction on their opportunity for meaningful participation in the September 8, 2006 hearing.

**Hearing**

¶36   Proponents posit the District Court denied them a meaningful hearing because the court compelled them to proceed without adequate time for discovery. Proponents contend the abridged timeframe allocated for trial preparation left them without *any* opportunity to conduct discovery. We disagree. The record shows that Proponents failed to utilize the time allocated by the court to conduct whatever discovery time allowed, or to avail themselves of the procedural remedies available to them.

¶37   Proponents rely on *Wilson v. Dept. of Public Service Reg.*, for the proposition that a "meaningful hearing can not [*sic*] be had when a party is made to proceed without the ability to discover the evidence and allegation to be advanced against them." 260 Mont. 167, 858 P.2d 368 (1993). We note at the outset that *Wilson* was an appeal from a Public

15

Service Commission (PSC) proceeding and not an appeal regarding a ballot initiative. Therefore, there was no legal or circumstantial requirement for expediency in *Wilson*—a distinction of significant consequence. That said, we did conclude that appellants in *Wilson* were denied discovery in violation of their due process rights. 260 Mont. at 172, 858 P.2d at 371. However, denial of the Wilsons' discovery motion was not the sole basis for our determination. Rather, we relied on cumulative circumstances to conclude that fundamental fairness and due process of law were denied. Specifically, the *decision appealed from* contained "no specification of the orders, rules or statutes which the Wilsons [were] alleged to have violated[,]" the Wilsons were not "afforded adequate, timely notice of the persons who [would] testify" nor did they know the "nature of the evidence" that would be presented in support of the PSC's revocation of their "valuable property right" in a transportation certificate. *Wilson*, 260 Mont. at 172, 858 P.2d at 371.

¶38    The circumstances underpinning the due process violation in *Wilson* are not present here. First, we disagree that the District Court's decision to expedite proceedings equated to denial of a motion for discovery as occurred in *Wilson*. Nothing prevented Proponents from utilizing the eleven days available to them to conduct discovery. Yet, Proponents conducted no discovery. Second, the District Court's decision from which Proponents now appeal clearly articulates which statutes Proponents ostensibly violated. Third, we previously determined that, unlike the Wilsons, Proponents were afforded adequate notice of the allegations against them, and had within their knowledge information with which to refute Opponents' allegations of address falsification. Finally, we agree with the District Court's determination that as a matter of law, Proponents

16

"have no political or legal right to vote" on the initiatives at issue here "until Proponents have duly qualified them for the ballot in the manner provided by law, free from the taint of fraud." Whereas it was determined Wilsons had an extant property right in their transportation certificate, here Proponents' "right" to vote on the initiatives cannot, even arguably, vest as a right to "life, liberty, or property," subject to due process requirements, until this Court determines whether Proponents legally qualified the initiatives for the November 2006 Montana ballot. Mont. Const. art. IV, § 7(1); § 7-5-132(3)(c), MCA.

¶39 Regardless of *Wilson*'s applicability, Proponents' due process claim rings hollow in light of the multiple respects in which they did not avail themselves of either the time they had or their recourse to the rules of civil procedure. Specifically, Proponents did not answer Opponents' Complaint, request any discovery, move for a continuance, take any depositions, or file a pre-trial brief. Proponents did not attend the three depositions conducted by Opponents (though they were scheduled to accommodate the schedule of Proponents' counsel), nor did they file proposed findings of facts or conclusions of law, despite the District Court's request for both from the parties. At the end of the September 5, 2006 scheduling conference, Proponents acquiesced without objection in the court's proposed schedule, and indicated they would not make any pre-trial motions.

¶40 Proponents' efforts at trial were similarly incomplete. They declined to make an opening statement or a closing argument. They opted not to cross-examine Opponents' main witness, Jacqueline Boyle. And, most significantly, their attorney did not object as multiple hearsay statements damaging to Proponents' case came into evidence through

17

the witnesses who testified. Under the same time constraints, Opponents conducted three depositions, filed the pre-trial brief and proposed findings of fact and conclusions of law suggested by the court, and then fully participated at trial, making appropriate arguments and objections as the rules of evidence allowed.

¶41 We conclude that any deprivation of a meaningful hearing here was more the construct of Proponents' own failure to act than it was a function of the District Court's denial of more time for trial preparation. Opponents timely brought their claims. The District Court was then required by law to expedite the proceedings. Simply put, the District Court proceeded as required by law. We therefore determine that under the circumstances, Proponents received both adequate notice of the allegations against them and an opportunity to participate in a meaningful hearing.

*ISSUE THREE*

¶42 *Did the District Court err when it determined that the signature gathering process was permeated by a pervasive and general pattern and practice of fraud and procedural non-compliance?*

¶43 The District Court conducted a one-day hearing on September 8, 2006, during which Opponents called three witnesses, the State called two, Intervenors called two, and Proponents called one. In addition, Opponents introduced three perpetuation depositions, multiple affidavits, the testimony of one signature gatherer given at a hearing before the Oklahoma Supreme Court, and numerous spread sheets, signature lists and calculations. Proponents introduced into evidence three certification affidavits signed by one of their signature gatherers and a fourth affidavit signed by a second signature gatherer.

18

¶44    On September 13, 2006 the court issued a detailed 46-page Order setting forth its analysis and rationale. The court found that three significant defects occurred: (1) Proponents' out-of-state signature gatherers routinely attested that they personally gathered or assisted in gathering signatures that, in fact, were gathered by other persons outside of their presence and without direct assistance from them; (2) Proponents' out-of-state signature gatherers used false addresses on their certification affidavits; and (3) at least some of these same signature gatherers employed a deceitful "bait and switch" tactic. We review each of these conclusions below.

**Certification Based on the Language "Assisted In"**

¶45    The District Court found that, under the totality of the circumstances, it was more probable than not that the out-of-state signature gatherers executed certification affidavits attesting that they personally gathered or assisted in gathering signatures that someone else actually gathered outside of their presence without any direct assistance from them. As further addressed below, the District Court received substantial evidence as to the vast number of signatures attested to by several of Proponents' paid out-of-state signature gatherers. This evidence established that the signers were located in various cities and counties throughout the state and that the attesting signature gatherer could not have possibly been present when many persons signed their petitions. Proponents did not rebut or refute this evidence at the hearing.

¶46    Instead, Proponents argue on appeal that to give meaning to the words "assisted in" as used in § 13-27-302, MCA, an affiant need not be present at the time the petition was signed. They also maintain that Montana law has a lax standard for signature

19

gatherer certification, vis-à-vis other states, as it does not expressly require the gatherer to attest that the signatures were received in his or her presence. Compare Oregon's statute, for example—"The circulator shall certify on each signature sheet that the individuals signed the sheet in the presence of the circulator . . . ." Or. Rev. Stat. § 249.740(4). Relying on *United Labor Committee of Mo. v. Kirkpatrick*, 572 S.W.2d 449 (Mo. 1978), Proponents further contend that because the Secretary of State certified the signatures, these signatures were verified and should not be invalidated by a technical deficiency, negligence or misconduct of a third party, i.e., the signature gatherer.

¶47 Opponents counter that it is well established that the signer of an affidavit must have personal knowledge of the information contained in the affidavit. *McDermott v. Carie, LLC*, 2005 MT 293, ¶ 26, 329 Mont. 295, ¶ 26, 124 P.3d 168, ¶ 26. They maintain that for a petition gatherer to sign the affidavit required in § 13-27-302, MCA, he or she must have a belief based on personal knowledge that the petition signers knew the contents of the petition before signing it. They assert that the District Court correctly determined that the affiant had to be present during the signing in order to meet this requirement.

¶48 Relevant to our analysis of this issue as well as the issues below are the definition of "signature gatherer" and the required contents of the affidavit for certifying signatures. Section 13-27-111(4), MCA (2005), defines "signature gatherer" as "an individual who collects signatures on a petition for the purpose of an initiative, a referendum, or the calling of a constitutional convention." Section 13-27-302, MCA (2005), sets forth the

20

following requirements for the affidavit that must be attached to each sheet or section of signatures submitted to the county official:

> I, (name of person who is the signature gatherer), swear that I gathered or assisted in gathering the signatures on the petition to which this affidavit is attached on the stated dates, that I believe the signatures on the petition are genuine, are the signatures of the persons whose names they purport to be, and are the signatures of Montana electors who are registered at the address or have the telephone number following the person's signature, and that the signers knew the contents of the petition before signing the petition.
>
> _____
> (date on which the first signature was gathered)
> _____
> (Signature of petition signature gatherer)
> _____
> (Address of petition signature gatherer)

¶49 Notably, these statutes were revised by the 2003 Legislature. Prior to the 2003 revisions, § 13-27-111(4), MCA (2001), provided that a "signature gatherer" was "an individual who collects or intends to collect signatures on a petition for the purpose of an initiative, a referendum, or the calling of a constitutional convention." Moreover, the 2001 version of § 13-27-302, MCA, read:

> I, (name of person who circulated this petition), swear that I circulated or assisted in circulating the petition to which this affidavit is attached, that I believe the signatures on the petition are genuine, are the signatures of the persons whose names they purport to be, and are the signatures of Montana electors who are registered at the address or have the telephone number following the person's signature, and that the signers knew the contents of the petition before signing the petition.
>
> _____
> (Signature of petition circulator)
> _____
> (Address of petition circulator)

According to the 2003 legislative history, the committee members discussing the then-proposed revisions indicated that the purpose of the revisions was to make the process

21

"more accountable." House Committee on State Administration, 2003 Reg. Sess. (Jan. 21, 2003).

¶50 The evidence established that Proponents hired and paid up to 43 out-of-state signature gatherers. The signatures gathered by five of these signature gatherers constituted more than half of the total signatures garnered.[4] These gatherers were Larry Shumacher, Grace Meyer, Ron Cook, Eric Rittberg, and Marvin King. These persons were paid on a per-signature basis. Schumacher was paid $84,103.30 for gathering signatures in five Montana counties; Meyer was paid $70,170.94 for collecting signatures in six Montana counties; Cook received $69,214.78 for his signature gathering efforts in six counties; and Rittberg was paid $18,155.68 for unspecified county petition drive efforts. No evidence was presented as to the amount Proponents paid King but evidence revealed that he swore to 41,761 signatures. Additionally, it was shown that he attested to signatures gathered from at least eight Montana counties, as geographically dispersed as Glacier, Gallatin, Yellowstone and Valley Counties. King submitted by affidavit approximately 15,000 signatures obtained during one two-week period. The District Court observed that he would have had to secure approximately one signature every minute during that period to reach this total.

¶51 Given that the claimed signatures were gathered from far-flung areas of the state, it is evident that King was not present when many of these signatures were obtained.

---

[4] A total of 125,609 signatures was certified—47,905 for CI-97; 49,956 for CI-98; and 27,748 for I-154. Of these 125,609, at least 64,463 were obtained or attested to by Proponents' signature gatherers, Shumacher, Meyer, Cook, Rittberg, and King. 25,426 of these signatures were for CI-97; 22,041 for CI-98; and 16,996 for I-154.

Proponents maintain that they obtained signatures from traveling Montanans (e.g., Bozeman residents visiting Billings signed a Billings' petition). While it is feasible that this occurred on occasion, Proponents proffered no evidence to support this claim. Moreover, it strains credulity to conclude that this occurred often enough to explain the thousands of signatures obtained from distant towns and cities by a single signature gatherer.

¶52 To determine whether Proponents' signature gatherers complied with the statutory requirements, we must read §§ 13-27-111(4) and 13-27-302, MCA, together. As indicated above the "signature gatherer," i.e., the person who collected the signatures, must swear under oath that he or she "gathered or assisted in gathering the signatures on the petition to which this affidavit is attached on the stated dates." It is undisputed that some of Proponents' signature gatherers attested to signatures that were obtained by other persons outside of the presence of the attesting affiant. The question is whether those certifications are lawful under the "assisted in" language of the affidavit. Proponents, of course, are advocating a broad construction of the phrase while Opponents offer a more narrow construction.

¶53 We construe statutes as they are written. *Ravalli County v. Erickson*, 2004 MT 35, ¶ 11, 320 Mont. 31, ¶ 11, 85 P.3d 772, ¶ 11. We must neither insert what has been omitted nor omit what has been inserted. Section 1-2-101, MCA. The term "assisted" is not defined in the statute; therefore, we look to its common dictionary meaning. *Ravalli County*, ¶ 13. "Assisted" is defined as: (1) to give aid or support; (2) to be present, as at a conference; (3) an act of giving aid; help. *The American Heritage Dictionary of the*

23

*English Language* 109 (4th Edition, Houghton Mifflin Company 2004). We have previously recognized the term "assistant" to mean "one who stands by and aids or helps another." *State v. Ayers*, 112 Mont. 120, 126, 113 P.2d 785, 788 (1941). Because the definition of both "assisted" and "assistant" could arguably contemplate one's presence or absence, we must look more closely at the context of the statute and its 2003 amendments.

¶54 As indicated above, the 2003 Legislature changed the definition of "signature gatherer" from the individual who "collects or intends to collect" signatures to the "individual who collects" signatures. Section 13-27-111(4), MCA (2001 and 2003). This was done, according to the legislative history, to provide "more accountability" to the signature gathering process. See ¶ 49. Similarly, the Legislature revised the certification affidavit to require that the "signature gatherer" rather than the person who "circulated the petition" sign the affidavit, and that the affiant swear that he or she "gathered or assisted in gathering" as opposed to "circulated or assisted in circulating the petition." Section 13-27-302, MCA (2001 and 2003). Again, these changes reflect the Legislature's interest in restricting rather than broadening the category of persons who could sign the affidavit.

¶55 While we acknowledge that the affidavit first requires the person who collected the signature to sign the affidavit but then has the affiant swear that he or she either gathered "or assisted in gathering" the signatures, there is no internal inconsistency. Reading the amended statutes together and giving full effect to both, it is easy to contemplate a team of signature gatherers working together, side-by-side, assisting one

24

another in obtaining signatures, explaining the contents of the initiative or referendum, determining whether a potential signer is qualified, and advising the signers as to the information required. Under this simple scenario, either signature gatherer could attest to the signatures gathered and lawfully sign the affidavit.

¶56 Additionally, the affidavit provides that the affiant may submit signatures if he or she "believes," the "signers knew the contents of the petition before signing the petition." Section 13-27-302, MCA. While this language arguably imposes a lesser standard than the "personal knowledge" standard argued by Opponents, it does not change our analysis or our conclusion. As we determined above, a reading of both statutes together mandates the presence of the affiant at the time a signature is gathered. Additionally, affiant must still swear to the validity of the contents of the affidavit. This would require his or her "belief" to have a reasonable foundation.

¶57 As did the District Court, we conclude that the revised language of both statutes contemplates something more than mere oversight of the process by a geographically remote affiant. As a result, we conclude that in order to lawfully swear under oath, with personal knowledge, that the affiant "gathered or assisted in gathering" signatures, and to swear that affiant believes that the signatures are genuine and the signers knew the contents of the petition before signing it, the affiant must be present at the time the petition is signed.

¶58 Again, Proponents presented no evidence to refute or rebut Opponents' evidence that the five most prolific signature gatherers swore to signatures obtained outside of their presence. The strength of Opponents' argument is further bolstered by the sheer numbers

25

of signatures submitted by these five signature gatherers and the physical impossibility that they could have been present at the time each of these signatures was obtained.

¶59 We conclude that the District Court did not err when it found that Shumacher, Cook, Meyer, Rittberg, and King executed affidavits submitting signatures that were gathered outside of their presence. As a result, they could not lawfully attest to the contents of the affidavits.

¶60 We cannot overstress our limited role as interpreters of the statutes. It is axiomatic that when interpreting a statute, we seek to implement the objectives the Legislature sought to achieve, and if the legislative intent can be determined from the plain language of the statute, the plain language controls. *City of Billings v. Gonzales*, 2006 MT 24, ¶ 8, 331 Mont. 71, ¶ 8, 128 P.3d 1014, ¶ 8 (internal citations omitted). When the legislative intent cannot be readily derived from the plain language, we review the legislative history and abide by the intentions reflected therein. *Denial of App. For Iss. Of Beer/Wine Lic.,* 267 Mont. 298, 303, 883 Mont. 833, 836 (1994). If the Legislature actually contemplated remote signature gathering, or mere "circulation" by the affiant—without more—there would have been no reason for the 2003 statutory amendments. In sum, we must apply the law as written and amended.

**False or Fictitious Addresses**

¶61 The District Court found that all 43 of Proponents' out-of-state paid signature gatherers gave false or fictitious addresses in their certification affidavits submitted under § 13-27-302, MCA. An element of the evidence supporting this finding was a spreadsheet prepared by one of Opponents' witnesses which set forth the names and the

26

claimed addresses of each of Proponents' signature gatherers. Boyle testified that, using an on-line data search engine, she attempted to confirm each address but was unable to do so. She stated that some of the provided addresses were hotels, retail stores or shopping centers; some were apartment complexes or personal residences at which the signature gatherer was not listed as a resident, and some addresses simply did not exist.

¶62 Additionally, the District Court relied on the testimony of one of Proponents' professional petition signature gatherers, Robert Colby, who testified at a hearing before the Oklahoma Supreme Court in a similar case. Colby stated under oath in that proceeding that it was a common practice for signature gatherers to use false or fictitious addresses in an effort to conceal personal information, avoid harassment, and "leave no trail." He admitted to having used a fictitious address while working for Proponents in Montana.

¶63 Butcher, testifying as the sole witness for Proponents, did not refute this evidence. He did testify that he had instructed one of the out-of-state signature gatherers, Marvin King, to use Butcher's sister's home address in Billings, though the circulator was not going to stay there. Butcher stated that King could have used his sister's address as a central drop-off or pick-up location during the petition drive, but presented no evidence that King ever used the address for such purposes. Moreover, evidence was presented that at one point during the petition drive, a Billings police officer stopped at Butcher's sister's house looking for King. Butcher's sister told him that she did not know who King was and that he was not living there.

¶64 Proponents argue on appeal that the District Court erred in narrowly defining "address" to mean a signature gatherer's residence as opposed to a place where the signature gatherer could be reached if necessary. Relying on *Munson v. Bay State Dredging & Contracting Co.*, 50 N.E.2d 633, 636 (Mass. 1943) and *In re Protest of Brooks*, 801 N.E.2d 514 (Ohio 2003), Proponents maintain that use of a temporary address, such as a hotel, satisfies the address requirement, as does any address at which the signature gatherer can be reached or where a message can be left. Proponents also argue that had they known that the 43 addresses were going to be contested, they could have verified "a great deal . . . if not all of them."

¶65 Opponents counter that the use of false addresses by out-of-state signature gatherers was just one example of the deceptive behavior utilized by Proponents' paid assistants. They maintain that the District Court, based on unrefuted evidence, correctly determined that the out-of-state signature gatherers attested knowingly to false addresses, i.e., addresses that were not their residences, places of business, or locations at which they could be contacted. Opponents cite *Kemp v. Monroe County Bd. Of Elections*, 493 N.Y.S.2d 529 (N.Y. Sup. 1985) (overruled on other grounds by *Kemp v. Monroe County Bd. of Elections*, 113 A.D.2d 1019 (N.Y. App. Div. 4th Dep't. 1985)), for the proposition that incorrect addresses on election petitions should result in invalidation of such petitions.

¶66 Opponents also assert, as discussed above, that Proponents had adequate notice that the address issue would be presented at the hearing. They maintain that as the employer of these paid out-of-state signature gatherers, Proponents should have been able

28

to readily verify addresses and contact information as well as present some of their signature gatherers as witnesses at the hearing.

¶67 To resolve this issue, we must once again read the revised versions of §§ 13-27-111(4) and 13-27-302, MCA, together. Under these statutes, the "signature gatherer" must sign the affidavit and provide his or her address. Presumably, the purpose of the address requirement is to provide a mechanism by which affiants may be contacted by county elections officials or the Secretary of State during the certification process. The term "address" is not defined in the statutes; therefore, as we have done in the past, we use its common dictionary meaning. See ¶ 53. "Address" means "the place or the name of the place where a person, organization, or the like is located or may be reached." *Dictionary.com Unabridged (v 1.0.1),* Random House Unabridged Dictionary, Random House, Inc. 2006.

¶68 The District Court did not state in its Order that the address provided by the affiant must be his or her residence. In fact, the court expressly concluded that the office address provided by one of the signature gatherers was acceptable. Therefore, Proponents' contention that the District Court erroneously imposed a residence address requirement is incorrect. However, it does appear that the District Court rejected as unacceptable a hotel address or the address of other temporary quarters where a gatherer may have stayed during the signature drive. Under *Brooks*, this was arguably error. As argued by Proponents and noted in *Brooks*, such a location may satisfy the address requirement, provided the signature gatherer can actually be reached there directly or through a message. *Brooks*, ¶ 26. The fact remains, however, that there was no proof that this

29

requirement of *Brooks*—accessibility to the gatherer at the listed address—was satisfied here.

¶69     The rules of statutory construction require the language of a statute to be construed according to its plain meaning. *Ravalli County*, ¶ 11. Using the ordinary everyday meaning of the words in § 13-27-302, MCA, affiants are required to provide addresses of the places where they can be reached or contacted. Substantial evidence was presented that affiants in this case did not do so but rather provided bogus or false addresses. Proponents did not refute or rebut this evidence and offered no countering testimony. The District Court, relying on the only evidence presented, concluded that the affidavits completed by these 43 signature gatherers contained false information, and as a result were tainted with illegality. *McDermott v. Carie,* ¶ 26 (An affidavit is legally defective unless "[t]he maker [has] personal knowledge of the information contained in the statement and . . . swear[s] to its validity.")

¶70     While we do not conclude that the statute necessarily requires an affiant to provide a residential address, we do conclude that the purpose of the address requirement in the statute is the provision of a legitimate contact point so that when questions regarding the petitions arise, the person who gathered those signatures can be reached. Otherwise, the questions go unanswered, and no one—not the County, the State, or the opponents of an initiative—is able to ascertain whether there has been compliance with the law.

¶71     Based upon the foregoing, we conclude that a signature gatherer must provide an address on the affidavit where he or she can be contacted throughout the collection and certification process.

¶72 The right of Montanans to change our constitution by initiative is a unique right granted by Article II, Section 2 of the 1972 Montana Constitution. It is our judicial duty to preserve this right wherever possible and to decline to interfere unless it appears to be absolutely essential. *State ex rel. Montanans v. Waltermire*, 231 Mont. 406, 412, 757 P.2d 746, 750 (1988). In this regard, it has long been established that initiative petitions signed and filed in accordance with applicable law are presumptively valid. *In re State Question No. 138*, 244 P. 801, 803 (Okla. 1926). However, that presumption of validity may be rebutted and overcome by affirmative proof of willful fraud or procedural non-compliance. *State Question No. 138*, 244 P. at 804. Once evidence is presented to rebut the presumption of validity, it is incumbent upon on the party endorsing the validity of the signatures—in this case the Proponents—to come forward with evidence to rebut or counter the damaging evidence. In the case before us, Proponents offered nothing to rebut or counter the evidence presented by Opponents that the addresses provided on the affidavits were false.

¶73 Given that Proponents were in the best position to refute Opponents' evidence of false affidavits and bogus addresses, and their failure to do so, the District Court did not err in accepting the unrefuted evidence presented and finding that false or fictitious addresses were provided.

**Bait and Switch**

¶74 Lastly, the District Court found that it was more probable than not that a significantly large percentage of the paid, out-of-state signature gatherers working for the Proponents employed a "bait and switch" tactic to induce people who knowingly signed

31

one petition to unknowingly sign the other two. The District Court relied upon six affidavits and three perpetuation depositions of petition signers who attested that they were personally misled by a signature gatherer into signing all three initiatives when they intended to sign only one. Most of these affiants also stated that they heard other signature gatherers misleading persons into signing all three petitions by claiming that, because the circulator had no carbon paper, the signer needed to sign the one petition three times. In addition to this evidence, another affiant testified that a signature gatherer had tried this tactic on her but before signing the other petitions she realized that they were different and she refused to sign them. Furthermore, a witness from the Secretary of State's Office testified that his office received complaints that this tactic was being used, and a witness working to oppose CI-97 also received reports that Proponents' signature gatherers were doing this.

¶75    In contrast, two of the three Intervenors testified at the hearing that they had not been subject to such a "bait and switch" tactic, nor had they seen signature gatherers employing such a tactic. The third Intervenor submitted an affidavit proclaiming the same. Butcher did not refute Opponents' evidence; rather, he conceded that the tactic had been used, but only for a short time.

¶76    Proponents argue on appeal that the evidence presented at the hearing was insufficient to support a finding that use of the "bait and switch" tactic was pervasive. They cite the testimony of the Intervenors and that of a few of Opponents' witnesses who had "heard about" the tactic but had not personally observed it. The problem is they ignore the substantial hearsay evidence heard by the court without objection from

32

Proponents, to the effect that this tactic was in fact being widely used, and that the Secretary of State had received multiple complaints to the same effect.[5] It is axiomatic that a district court is free to consider hearsay testimony if there is no objection to its admission into evidence. *State v. Vandersloot*, 2003 MT 179, ¶ 27, 316 Mont. 405, ¶ 27, 73 P.3d 174, ¶ 27. Thus, the court had before it far more evidence of the use of the "bait and switch" tactic than Proponents are willing to concede on appeal.

¶77 The question we must answer is whether the court's finding of pervasive use of the tactic is supported by substantial evidence. See ¶ 19. As we note above, Opponents presented evidence of the use of this practice through testimony from two witnesses, the affidavits of seven witnesses, and the perpetuation depositions of three others. They offered the testimony of Alan Miller from the Secretary of State's office regarding the complaints that office received regarding the practice. Finally, they established through county lists of votes that an inordinately large percentage of voters signed not one but all three petitions. For example, 60.64% of Lake County petition signers signed all three petitions; 64.97% of Cascade signers and 66.9% of Flathead County signers did the same. In response, Proponents offered no evidence, nor did they object to or attempt to discredit the evidence offered by Opponents.

¶78 It is the province of the District Court to weigh the evidence and resolve any conflicts between the positions of the parties. It is well established that this Court will

---

[5] It should be noted that counsel for Intervenors did object to the admission of hearsay evidence on more than one occasion throughout the hearing; however, they are not parties to this appeal. See ¶ 18. More importantly, because Proponents have not even attempted to argue on appeal that admission of hearsay was error, the issue has been waived by them in any event.

not second-guess the district court's determination regarding the strength and weight of conflicting testimony. Moreover, we review a district court's findings to determine whether substantial evidence supports those findings, *not contrary findings*. *Denton v. First Interstate Bank of Commerce*, 2006 MT 193, ¶ 43, 333 Mont. 169, ¶ 43, 142 P.3d 797, ¶ 43 (internal citations omitted).

¶79 While "substantial evidence" cannot be definitively quantified, we have previously stated that "[s]ubstantial evidence is the amount of relevant evidence which a reasonable mind might accept as adequate to support a conclusion." *Lee v. Lee*, 2000 MT 67, ¶ 20, 299 Mont. 78, ¶ 20, 996 P.2d 389, ¶ 20. Once Opponents established that Proponents' signature gatherers were engaging in deceptive practices, it became Proponents' burden to produce evidence to the contrary. Section 26-1-401, MCA. They failed to do so. Therefore, we conclude that the District Court's finding and conclusion that Proponent's signature gatherers' deceptive actions were pervasive was based on substantial evidence and was not clearly erroneous.

**Invalidation of Signatures**

¶80 The District Court ultimately concluded that these three unlawful practices—certification of signatures that were not signed in the presence of the affiant, false addresses, and bait and switch tactics—resulted in legally defective certification affidavits and constituted a "pervasive and general pattern and practice of fraud and conscious circumvention of procedural safeguards," in violation of state laws relating to qualification of an initiative on the ballot. As it was impossible to precisely identify which certified signatures were untainted by Proponents' signature gatherers' various

34

deceptive practices, the District Court invalidated all signatures gathered by all of Proponents' out-of-state paid workers. As a result the Secretary of State's certifications of CI-97, CI-98, and I-154 were likewise invalidated.

¶81 Proponents maintain that the District Court erred by grouping all out-of-state signature gatherers together and invalidating all of their signatures. Without supporting authority, they assert that the signatures of each signature gatherer should have been contested on an individual basis.

¶82 Opponents submit that the District Court correctly invalidated the certified signatures gathered by the paid out-of-state signature gatherers based on substantial, unrefuted evidence of the pervasive illegalities and deceptive practices established at the hearing, and the impossibility of distinguishing which signatures were gathered in accordance with the statutory requirements and which were not.

¶83 As did the District Court, we conclude that the filing of a false affidavit by a signature gatherer is "more than a technicality" in that it destroys the primary procedural safeguard for ensuring the integrity of the signature gathering process. The Maine Supreme Court, addressing a similar situation, recognized:

> [I]t is evident that the circulator's role in a citizens' initiative is pivotal. Indeed, the integrity of the initiative and referendum process in many ways hinges on the trustworthiness and veracity of the circulator. In reviewing the signatures gathered by the circulators, the Secretary [of State] has the ability to verify . . . that a signing voter is actually registered and therefore permitted to vote. In contrast, the Secretary has no way, without engaging in a separate investigation, to verify that a signing voter actually signed the petition.
>
> * * *

35

In addition to obtaining truthful information from the circulator, the oath is intended to assure that the circulator is impressed with the seriousness of his or her obligation to honesty . . . and to assure that the person taking the oath is clearly identified should questions arise regarding particular signatures. . . . As early as 1917, we held that verification of the signatures and the subsequent oath taken by the circulator is an "indispensable accompaniment of a valid petition," and, accordingly, that the invalidation of signatures lacking this prerequisite is necessary to preserve the integrity of the initiative and referendum process.

*Taxpayers Action Network v. Sec. of State*, 795 A.2d 75, 80 (Me. 2002).

¶84 Other courts have also invalidated signatures upon a finding that the signature gatherers did not comply with the applicable statutory requirements. See *State Question No. 138*, 244 P. at 804 (invalidating signatures collected by persons other than the affiant); *Weisberger v. Cohen*, 22 N.Y.S.2d 1011, 1012 (N.Y. 1940) (the only sure way to prevent fraud is to invalidate all signatures tainted by fraud); *In Matter of Lombardi v. State Board of Elections,* 54 A.D.2d 532, (N.Y. App. Div. 3rd Dep't., 1976) (court invalidates two entire sheets of signatures when they were "permeated with fraud"); and *Citizens Committee v. DC Bd. Of Elections*, 860 A.2d 813, 818 (D.C. 2004) ("In cases of proven false signing of affidavits, the Board thus has undeniable authority to strike whole petition sheets associated with that impropriety."). Additionally, the Secretary of State may reject any petition that does not meet the statutory requirements. Section 13-27-307, MCA.

¶85 Some will argue that use of a "bait and switch" tactic does not warrant the invalidation of the signatures on the "bait" petition, as many persons arguably signed it voluntarily and knowingly. Others may claim that invalidating signatures due to the use of false addresses by 43 signature gatherers is excessive, and an elevation of form over

36

substance. However, it bears emphasis that we are not deciding this case based solely on a conclusion that one or the other event occurred in isolation. As did the District Court, we consider here the totality of the circumstances of the claims before us, as well as the totality of the unrefuted evidence presented by Opponents without substantial objection from Proponents. Taking account of all the evidence, we conclude that the District Court did not err when it invalidated the signatures of Proponents' out-of-state signature gatherers that were obtained in a manner that did not comply with Montana statutes and were tainted by or associated with deceptive practices and misrepresentation.

¶86 We acknowledge that many voters feel strongly that they should have the opportunity to vote on one or more of these initiatives, and that these people will feel disenfranchised by our decision. This is extremely regrettable. The fact remains, however, that if the initiative process is to remain viable and retain its integrity, those invoking it must comply with the laws passed by our Legislature. We can neither excuse nor overlook violations of these laws, for to do so here would confer free reign for others to do so in other matters. We must enforce the law as written and as the Legislature intended.

¶87 County administrators are instructed not to count the votes for CI-97, CI-98 and I-154 to the extent that this is technically feasible. If the votes must be counted, they will have no force or effect.

37

## CONCLUSION

¶88    For the foregoing reasons, we affirm the District Court's Findings of Fact, Conclusions of Law and Order Invalidating Certification of CI-98, CI-97, and I-154.


/S/ PATRICIA COTTER


We concur:

/S/ KARLA M. GRAY
/S/ BRIAN MORRIS
/S/ JAMES C. NELSON
/S/ W. WILLIAM LEAPHART

/S/ TED L. MIZNER
District Court Judge Ted L. Mizner
sitting for Justice Jim Rice

/S/ THOMAS C. HONZEL
District Court Judge Thomas C. Honzel
sitting for Justice John Warner