OP 10-0366, OP 10-0371

IN THE SUPREME COURT OF THE STATE OF MONTANA

2010 MT 185

_____

MONTANA CONSUMER FINANCE ASSOCIATION,

       Petitioner,

   v.

STATE OF MONTANA, by and through STEVE BULLOCK,       O P I N I O N
in his capacity as the Attorney General, and LINDA McCULLOCH,
in her capacity as Secretary of State.                    A N D

       Respondent.                             O R D E R

_____

BERNARD J. HARRINGTON, Individually, and
as Treasurer for Coalition for Consumer Choice
Against I-164, a Political Committee,

       Petitioner,

   v.

STATE OF MONTANA, by and through STEVE BULLOCK,
in his capacity as the Attorney General, and LINDA McCULLOCH,
in her capacity as Secretary of State,

       Respondent.

_____

¶1     Petitioner Bernard J. Harrington in his individual capacity and as representative of the Coalition for Consumer Choice Against I-164 (Harrington) and Petitioner Montana Consumer Finance Association (MCFA) (Collectively "Petitioners") invoke this Court's original jurisdiction to challenge the Attorney General's legal sufficiency determination and ballot statements for Initiative No. 164 (I-164). We review the following issue:

¶2 *Do the Attorney General's ballot and fiscal statements comply with § 13-27-312, MCA?*

**FACTUAL AND PROCEDURAL BACKGROUND**

¶3 I-164 seeks to cap interest rates for certain loans at an annual interest rate of 36 percent. Petitioners challenge the ballot statements and Attorney General's legal sufficiency determination for I-164 under § 13-27-316, MCA. Section 13-27-316, MCA, constitutes the "exclusive remedy" for such challenges. I-164 would affect interest rates on certain lenders. Section 1 proposes a finding that some lenders are charging Montanans more than 400% interest annually. Section 2 would repeal exemptions on interest rate limits and usury provisions for deferred deposit lenders, title lenders, and consumer loan licensees. Section 3 would provide for penalties for violation of the initiative under the Consumer Protection Act. Section 4 caps the finance charge on retail installment contracts at 36% annually. Section 5 caps the interest rates for pawnbrokers. Section 6 limits fees for deferred deposit loans to 36% annually and provides for allocation of attorneys fees. Section 7 caps the interest rate at 36% for title loans. Section 8 limits interest rates to 36% for "consumer loans," a statutory term that excludes deferred deposit, title, mortgage backed loans, and loans by "regulated lenders." Section 9 provides that the statutory amendments would take effect on January 1, 2011.

¶4 The Attorney General found that the proponents' proposed ballot statement did not specify the type of loans subject to the limits and contained "potentially argumentative and misleading detail about federal legislation concerning military personnel and their

2

families." The Attorney General determined that the statements did not comply with the requirements of § 13-27-312, MCA, and redrafted the ballot statement. The Attorney General requested a fiscal note from the Budget Director. The fiscal note estimated a reduction in licensing and examination revenue of $189,900 per year, totaling $526,800 over the three year analysis period, and no impact to the General Fund. The Attorney General drafted the fiscal statement in accordance with the finding that there would be a fiscal impact if I-164 were to become law. Section 13-27-312(3), MCA.

¶5 The Attorney General's amended ballot statement reads as follows:

### Statement of Purpose

Under Montana law, deferred deposit (payday) lenders may charge fees equaling one-fourth of the loan, which is the same as an annual interest rate of 300 percent for a 31 day loan or 650 percent for a 14-day loan. Title lenders may charge interest equaling one-fourth of the loan, which is the same as an annual interest rate of 300 percent for a 30 day loan. I-164 reduces the interest, fees, and charges that payday, title, and retail installment lenders may charge to an annual interest rate of 36 percent. It prohibits businesses from structuring other transactions to avoid the rate limit.

### Fiscal Statement

I-164 reduces the licenses and examination fee revenue paid to the State because certain lenders may not renew their licenses.

[] FOR reducing the annual interest, fees, and charges payday, title, and retail installment lenders may charge on loans to 36 percent.

[] AGAINST reducing the annual interest, fees, and charges payday, title, and retail installment lenders may charge on loans to 36 percent.

¶6 The Secretary of State certified I-164 in accordance with § 13-27-308, MCA, on July 19, 2010. Petitioners filed suit under § 13-27-316, MCA. Section 13-27-316(5), MCA, endows this Court with original jurisdiction to hear challenges to ballot statements

3

and constitutes the "exclusive remedy" for such challenges. Both Harrington and MCFA challenged the ballot statements for failure to comply with the substantive requirements of § 13-27-312, MCA. Harrington argued that the statements of purpose and implication failed to "express a true and impartial explanation of the proposed measure in plain, easily understood language." Harrington also challenged the fiscal statement under § 5-4-205, MCA. MCFA claims that the ballot statement for I-164 does not meet the requirements of § 13-27-312(4), MCA, because it fails to specifically mention "consumer loan licensees" in the statement of purpose. MCFA contends that, due to this omission, the statement does not constitute a "true and impartial explanation of the proposed ballot issue." Section 13-27-312(4), MCA. MCFA argues that voters would be misled and thus precluded from casting an informed ballot. Harrington requested that this Court adopt an alternative ballot statement that Harrington provided. MCFA requested that this Court overturn the Attorney General's legal sufficiency determination and, alternatively, that we strike the term "consumer loan licensee" from the text of the initiative. Nearly two weeks after filing his initial petition, Harrington filed with this Court a motion for referral to district court for development of the factual record under § 3-2-202, MCA.

**JURISDICTION AND VENUE**

¶7 This Court possesses original jurisdiction to review ballot statements for initiative measures and the Attorney General's legal sufficiency determination in actions brought pursuant to § 13-27-316, MCA. Section 13-27-316, MCA, constitutes the sole remedy for such challenges.

4

**DISCUSSION**

¶8    *Do the Attorney General's ballot and fiscal statements comply with § 13-27-312, MCA?*

¶9    We must address as a threshold matter Harrington's motion for referral to the district court pursuant to § 3-2-202, MCA. Harrington did not raise issues of fact in his initial petition, and no issues of fact exist to preclude this Court from deciding Harrington's petition. More importantly, § 3-2-202, MCA, does not apply to Harrington's petition. Section 3-2-202(3)(b), MCA, requires that the parties to a proceeding under Subsection (3)(a) must "certify the absence of factual issues or stipulate to and file any factual record necessary" to this Court's consideration of the challenge. That provision applies to the *petitioner's* ballot statements for initiated measures and the Attorney General's ballot statements for referred measures. Section 3-2-202(3)(a), MCA. Harrington's petition challenges the Attorney General's ballot statement for an initiated measure and therefore does not fall into either of the categories specified by § 3-2-202(a), MCA. Harrington's petition likewise does not come within the ambit of the statute as a challenge under § 13-12-316, MCA, to the Attorney General's legal sufficiency determination. The legal sufficiency determination applies only to "the statutory and constitutional requirements governing submission of the proposed issue to the electors." Section 13-27-312(7), MCA. "Legal Sufficiency" does not encompass "consideration of the substantive legality of the issue if approved by the voters." *Id.* Harrington's petition raises only substantive legal arguments concerning the legality of the ballot statements

5

and underlying initiative. We therefore deny Harrington's motion for referral and proceed to analyze both petitioners' claims under §§ 13-27-312 and -316, MCA.

¶10 Ballot statements must "express the true and impartial explanation of the proposed ballot issue in plain, easily understood language and may not be arguments or so written as to create prejudice for or against the issue." Section 13-27-312(4), MCA. We have refused to overturn the Attorney General's version of a ballot statement, provided that the statement meets the statutory requirements. *Citizens Right to Recall v. State*, 2006 MT 192, ¶ 10, 333 Mont. 153, 142 P.3d 764. This practice reflects the rule followed in other jurisdictions that courts "do not sit as some kind of literary editorial board." *Shulte v. Long*, 687 N.W.2d 495, 498 (S.D. 2004). Courts thus will not "invalidate a summary simply because they believe a better one could be written." *Burgess v. Miller*, 654 P.2d 273, 276, n. 7 (Alaska 1982).

¶11 The Attorney General's ballot statement meets the requirements of the statute so long as it employs "ordinary plain language, explains the general purpose of the issues submitted in language that is true and impartial, and [is] not argumentative or likely to create prejudice either for or against the issue." *Stop Over Spending Mont. v. State*, 2006 MT 178, ¶ 12, 333 Mont. 42, 139 P.3d 788. We review the Attorney General's ballot statements solely for compliance with § 13-27-312, MCA. *Citizens Right to Recall*, ¶ 13. The statute does not grant petitioners "the right to the ballot statements of their choosing." *Id*.

6

¶12 The Attorney General determined that "the application of a 36% annual interest rate to consumer loans is more straightforward and, based on the public comments received, less salient than the core payday, title, and retail installment issues." The process of producing a 100 word purpose statement that constitutes a "true and impartial explanation" of the measure "involves a degree of discretion entrusted to the Attorney General by the Legislature that we will not overturn absent noncompliance with the statute." *Citizens Right to Recall*, ¶ 18. We acknowledge that the statutory 100 word limit on statements of purpose will inevitably lead to the omission of some provisions that Petitioners would like to include. *Citizens Right to Recall*, ¶ 18. A complete description of every part of the measure cannot be included. *Stop Over Spending Mont.*, ¶ 17.

¶13 Petitioners argue that the Attorney General's statements of purpose and implication do not constitute a "true and impartial explanation" of what the measure would do because they identify specifically "deferred deposit lenders," "title lenders," and "retail installment lenders," but not "consumer loan licensees." Section 13-27-312(4), MCA. MCFA requests that we remedy this fault by striking the term "consumer loan licensees" from the body of the measure. Section 13-27-316, MCA, does not give this Court the authority to modify the text of a ballot initiative. The statute does provide, however, that "if this court decides that the ballot statements do not meet the requirements of 13-27-312, it may . . . certify to the secretary of state a statement that the court determines will meet the requirements of 13-27-312, MCA." Section 13-27-

7

316(3)(c)(ii), MCA. We determine therefore that adding the term "consumer loan licensees" to the statements of purpose and implication and making other minor additions and stylistic changes will be the most effective remedy for the omission of which MCFA complains. The amended ballot statement shall read as follows:

**Statement of Purpose**

Under Montana law, deferred deposit (payday) lenders may charge fees equaling one-fourth of the loan, which, as an annual interest rate could range from 300 percent to 650 percent. Title lenders may charge similar interest rates. I-164 reduces the interest, fees, and charges that payday lenders, title lenders, retail installment lenders, and consumer loan licensees may charge to an annual interest rate of 36 percent. It prohibits businesses from structuring other transactions to avoid the rate limit. It also revises statutes applicable to pawn brokers and junk dealers.

**Fiscal Statement**

I-164 reduces the licenses and examination fee revenue paid to the State because certain lenders may not renew their licenses.

[] FOR reducing the annual interest, fees, and charges payday, title, and retail installment lenders and consumer loan licensees may charge on loans to 36 percent.

[] AGAINST reducing the annual interest, fees, and charges payday, title, and retail installment lenders and consumer loan licensees may charge on loans to 36 percent.

¶14 Harrington next claims that the Attorney General's fiscal statement does not comply with the requirements of § 13-27-312, MCA, and that the fiscal statement is argumentative and creates prejudice. The statute requires that the Attorney General shall prepare a fiscal statement if the fiscal note indicates a fiscal impact. Section 13-27-312(3), MCA. The statement must be used on the petition and ballot. *Id.* The statute does not stipulate what information must be included in the fiscal statement. The Attorney General acted within his discretion in formulating the fiscal statement at issue

8

here. The Attorney General's fiscal statement accurately provides that I-164 will reduce the license and examination fee revenue paid to the state "because certain lenders may not renew their licenses."

¶15 Harrington claims also that the Attorney General failed to formulate the fiscal note and fiscal statement in accordance with the statutory provisions because the Budget Director failed to consult with the Department of Revenue. The Attorney General must order a fiscal note that estimates the effect on revenue if the proposed initiative will affect the State's revenue, expenditures, or fiscal liability. *Id.* The fiscal note must estimate, where possible, the dollar amount of the increase or decrease in revenue or expenditures, costs, and long term financial effects. Section 5-4-205, MCA. The fiscal note serves as an objective analysis of the financial impacts of the legislation and may not comment or express an opinion upon the merits of the proposed legislation. *Id.* The Attorney General must prepare a fiscal statement if the fiscal note indicates that a fiscal impact will occur as a result of the proposed legislation. The Attorney General's fiscal statement must be included on the petition and on the ballot if the issue is placed on the ballot. Section 13-27-312(3), MCA.

¶16 The thrust of Harrington's argument appears to be that the Department of Revenue constitutes an agency "affected by the ballot issue," and therefore should have been consulted by the Budget Director pursuant to § 13-27-312(3), MCA. The Budget Director consulted with the Division of Banking and Finance in the Department of Administration. The fiscal note complies with the requirements of § 5-4-205, MCA, and

the statute requires nothing more. Harrington requests that we include language as to the exact amount of revenue estimated to be lost and the volume of such loans processed in the state each year. This information falls outside the statutory requirements under these circumstances. The fact that the Attorney General failed to include this information in the fiscal statement "does not prevent a voter from casting 'an intelligent and informed ballot.'" *Citizens Right to Recall*, ¶ 18.

¶17 Petitioners' arguments as to prejudice are similarly unavailing. Ballot statements must "eschew advocacy – argument – for or against the proposal's adoption." *Id.*, ¶ 20 (citing *Fairness and Acct. in Ins. Reform v. Greene*, 886 P.2d 1338 (Ariz. 1994)). Petitioners fail to point to specific provisions in either the statement of implication or the fiscal statement that violate this requirement.

¶18 Resolution of these matters has been unnecessarily complicated by the language of the revised statutes at issue. The intent of § 13-27-316, MCA, is to provide – via an original proceeding in this Court – the "sole remedy" for challenges to ballot statements or the Attorney General's opinion as to legal sufficiency. The statute's confused and internally contradictory language, however, threatens to frustrate the will of voters who have expressed their intent that a measure appear on the ballot. Section 13-27-316, MCA, applies to statements that have been approved by the Attorney General. Such statements, of necessity, have already been circulated for voter signatures. In particular, § 13-27-316(2), MCA, contemplates challenges to ballot statements "approved by the attorney general." The statute then requires, however, that statements revised by this

10

Court and certified to the secretary of state must be placed "on the petition for circulation *and* on the official ballot." Section 13-27-316(3)(c)(ii), MCA (emphasis added). Statements that have been approved by the Attorney General have of necessity already completed the circulation process. Compliance with all provisions of subsection (3)(c)(ii) is thus rendered impossible in cases such as the present when a party brings a challenge under § 13-27-316, MCA, mere weeks before the statement would be placed on the ballot. Notwithstanding this and other internal inconsistencies, we have attempted to apply the statute in accordance with the obvious legislative intent and with due consideration for the expressed will of Montana's voters.

¶19 We decline Petitioners' request to overrule the Attorney General's legal sufficiency determination for I-164, or to tamper with the text of the initiative itself. *Citizens Right to Recall*, ¶ 29. The Attorney General acted within his considerable discretion in drafting the ballot statements and fiscal statement for I-164. We determine, however, that MCFA's complaint as to the omission of the term "consumer loan licensees" from the statement of purpose is valid. We therefore certify to the Secretary of State the ballot statement set forth at ¶ 13, which we have determined will meet the requirements of § 13-27-312, MCA.

DATED this 17th day of August, 2010.

/S/ BRIAN MORRIS

We Concur:

/S/ W. WILLIAM LEAPHART
/S/ PATRICIA COTTER
/S/ MICHAEL E WHEAT

Justice Brian Morris specially concurs.

¶20    Winston Churchill observed in a speech before the House of Commons in 1947 that "[d]emocracy is the worst form of government except for all of those other forms that have been tried from time to time." Direct democracy removes the filter of the voters' elected representatives and takes the audacious step of posing questions directly to the voters. Montana voters originally adopted the initiative process in 1906 as part of the incomplete effort to cast aside the "copper collar" that bedeviled Montana politics for much of the 20th century.

¶21    Montana's 1972 Constitutional Convention considered carefully the issue of whether to continue this experiment in direct democracy. The delegates opted to include in the Constitution an express right of the people to amend the Constitution or enact laws through the initiative process. Mont. Const., art. III, Sec. 4. This considered decision by the delegates to the 1972 Constitutional Convention followed more than 65 years of

12

experience with the initiative system in place. The people's right to constitutional and statutory initiatives represents "a unique and important retained power." *State ex rel. Montana Sch. Bd. v. Waltermire*, 224 Mont. 296, 299, 729 P.2d 1297, 1299 (1986). Its inclusion in the Constitution "emphasizes the degree of control the people desired to retain" over changes to the Constitution or statutes. *Id*.

¶22 The initiative process allows citizens to put before voters issues that their elected representatives either have chosen not to address, or more likely, have been unable to resolve. These issues range from the enlightened, such as Constitutional Amendment 3, commonly known as the coal severance tax trust fund; to the controversial, Constitutional Amendment 64, the term limits initiative, Initiative 143, restricting trophy hunting on game farms, Initiative 122, protection of water quality from metal mines, and Initiative 125, prohibiting corporate contributions to ballot issue campaigns; to the banal, Constitutional Amendment 25, a provision that added the public retirement system to the State's unified investment program. The initiative process relies on the wisdom of the voters to separate sound policy proposals from the fad of the month-type proposals. For better or worse, the right to amend the Constitution or enact laws by initiative has served the people of Montana for more than a century.

¶23 The Dissent oozes with hostility toward this initiative process. The Dissent editorializes about the knowledge, or lack thereof, that "most voters" possess with respect to a policy proposal. ¶ 65, n.4. The Dissent fails to inform where it gains its insights into

13

the minds of "most voters." I believe these questions best left to pollsters and political scientists.

¶24 This same lack of confidence in the knowledge of the voters animates the Dissent's "bait-and-switch fraud" argument. The Dissent suggests that this Court's minor revisions to the Attorney General's ballot statement could lead to certain voters unwittingly signing a petition in support of an initiative that they otherwise would not support. This argument ignores the fact that the law requires all petitions for signatures to include a statement of purpose, statements of implication, fiscal impact statement, if required, *and* a complete copy of the proposed initiative. Sections 13-27-202 and -312, MCA.

¶25 The statement of purpose represents only a summary of the proposed initiative. Interested voters have the opportunity to read the entire petition, if they choose, before deciding whether to sign the petition. The legislature empowered the Court to amend the ballot statement to reflect more accurately the initiative's intent. The legislature did not authorize the Court to amend the language of the proposed initiative itself. The Court has not changed one jot of the language of the proposed initiative. This safeguard protects against any effort to "mislead the voters" – whether that effort be made by the Attorney General, the initiative proponents, or any other party that the Dissent assumes may seek to dupe the unwary citizenry.

¶26 The Dissent next suggests that the Court favors a party to this dispute. ¶ 67, n.5. The Dissent implies that the Court has disregarded its constitutional oath of office by

14

taking sides in a case. Mont. Const., art. III, Sec. 3. I take seriously my responsibility to decide cases without bias or partiality to any party. Canons of Jud. Ethics, Rule 2.2. I am sure that my colleagues do the same. In fact, this Court scrupulously has avoided taking sides in this dispute. The Court simply has sought to provide a remedy to this dispute in a manner that complies with the statutory scheme developed by the legislature. The legislative remedy allows this Court the ability to revise the Attorney General's statement of purpose to reflect more accurately the intent of the proposed initiative. Section 13-27-316(3)(c)(ii), MCA.

¶27 The Court has elected to pursue this remedy. In choosing an appropriate remedy, the Court must be guided by principle that "initiative and referendum provisions of the Constitution should be broadly construed to maintain the maximum power in the people." *Nicholson v. Cooney*, 265 Mont. 406, 411, 877 P.2d 486, 488 (1994); *Chouteau County v. Grossman*, 172 Mont. 373, 378, 563 P.2d 1125, 1128 (1977). The maximum power in the people requires that the people be given the opportunity to vote on an initiative when the requisite number of voters have signed petitions to qualify a measure for the ballot and the proponents of the measure have complied with the statutory scheme put in place by the legislature.

¶28 The Dissent snickers over the Court's use of the term "statutory scheme" to describe the system enacted by the 2007 Legislature to address the process by which an initiative may qualify for the ballot and by which a party may challenge that process. The snickering infers that the statutes enacted to address this process represent some sort

15

of con game designed to trap unwary voters. The Dissent suggests that proponents of initiatives could avoid these traps for the unwary by getting their acts together early in the process. The Dissent proposes that initiative proponents could gather sufficient signatures months in advance of the deadline, obtain all of the necessary clearances from the Secretary of State and the Attorney General, defend the matter before this Court, and then, if the Court decided to revise slightly the ballot statement, collect the thousands of signatures all over again before the statutory deadline. This proposal would gut the people's constitutional right to initiative. The fact that Montana voters face only a handful of proposed constitutional and statutory initiatives at each election cycle reflects the difficulty of qualifying a proposed initiative for the ballot. The Dissent's proposal would eliminate even these handfuls of proposals from consideration by the people.

¶29 The Dissent finally blithely recommends that the people demand that their elected representatives regulate interest rates if "such a public hullabaloo" actually exists over these interest rates. ¶ 73. The people of Montana ensured that they would not be without power to address issues of policy – whether accompanied by a "public hullabaloo" or simply supported by a group of concerned people – when they adopted the initiative system. The delegates to the 1972 Constitutional Convention confirmed the wisdom of this approach. The people need not rely on their elected representatives to enact a law that would restrict interest rates charged by certain lenders. Article II, Section 3 of our Constitution enshrines that right. I would not undermine this power. I support the

16

Court's remedy to revise the Attorney General's ballot statement for I-164 to reflect more accurately the Initiative's intent.

/S/ BRIAN MORRIS

Justice W. William Leaphart joins in the foregoing special concurrence.

/S/ W. WILLIAM LEAPHART

Justice James C. Nelson, dissenting.

## I. Overview

¶30     *" '[T]here are few evils which can be afflicted by strict adherence to the law so great as that which is done by an habitual disregard, by any department of the government, of a plain requirement of that instrument from which it derives its authority, and which ought, therefore, to be scrupulously observed and obeyed.' "*[1]

---

[1] *State ex rel. Montana Citizens v. Waltermire*, 227 Mont. 85, 93, 738 P.2d 1255, 1260 (1987) (quoting *State ex rel. Woods v. Tooker*, 15 Mont. 8, 13, 37 P. 840, 842 (1894)).

¶31 The *only* action that this Court is statutorily authorized to take in the present cases is clear. "If, upon review, the attorney general or the supreme court revises the petition form or ballot statements, **any petitions signed prior to the revision are void**." Section 13-27-316(4), MCA (emphasis added). Here, the Court has revised the ballot statements. Accordingly, "any petitions signed prior to the revision are void." Section 13-27-316(4), MCA. And without valid petitions, the ballot issue may not appear on the ballot. *See* §§ 13-27-307, -308, MCA; *see also e.g.* § 13-27-316(3)(c)(iii), MCA. That is the holding we are required to reach.

¶32 Regardless that this result may seem harsh to some, it is the result mandated under the initiative procedures adopted by the people through their elected representatives. This Court is required to scrupulously observe and obey those procedures. We are not at liberty to rewrite them, nor is it our prerogative to disregard them. And there is no "obvious legislative intent" justifying what the Court has done here.

¶33 In this regard, it should be noted that the timetable laid out by the Legislature is not as "impossible" as the Court majority would have us believe. That timetable proceeds as follows:

1. A proponent of a ballot issue first submits the proposed issue to the Secretary of State, together with draft ballot statements (the statement of purpose, fiscal statement, and statements of implication). Section 13-27-202(1), MCA. The Secretary of State forwards a copy of the proposed issue and statements to the Legislative Services Division and, thereafter, to the Attorney General. Section 13-27-202(1), (4), MCA. The Legislative Services Division is given 14 days to complete its review, § 13-27-202(2)(b), MCA, and the Attorney General is given 30 days to complete his review, § 13-27-312(8)(a), MCA.

18

2. Once approved, the proponent may circulate petitions for the purpose of signature gathering starting one year before the deadline for filing the signed petitions with county election officials. Section 13-27-202(1), (5)(b), MCA. Signed petitions may be submitted to county election officials as early as nine months, but no later than four weeks, before the deadline for filing the petitions with the Secretary of State. Section 13-27-301(1), MCA. The deadline for filing the petitions with the Secretary of State is the third Friday of the fourth month prior to the election (here, July 16, 2010). Section 13-27-104, MCA. Thus, the proponent of a ballot issue for the November 2, 2010 ballot could theoretically start circulating petitions as of June 16, 2009, and submitting signed petitions to county election officials as of October 16, 2009, but no later than June 16, 2010.[2]

3. County election officials are required to verify names and signatures within four weeks after receiving the sheets or sections of a petition. Section 13-27-303(1), MCA. The petitions are then forwarded to the Secretary of State. Section 13-27-304, MCA.

4. Once a sufficient number of signatures have been filed with the Secretary of State, he or she must "immediately" certify to the Governor that the completed petition has been officially filed. Section 13-27-308, MCA. That occurred in the present case on July 19, 2010.

5. An opponent then has ten days in which to file a challenge to the ballot statements or the legal sufficiency of the petitions. Section 13-27-316(2), MCA. This Court must give the case "precedence" and render a decision "as soon as possible." Section 13-27-316(3)(c)(i), MCA.

¶34 If we determine that the petitions are not legally sufficient, then the proponent may start over using legally sufficient petitions. Section 13-27-316(3)(c)(iii), MCA. Of course, the proponent remains subject to the deadline on submitting the petitions. But it is not necessarily "impossible" to comply with the foregoing timetable. To be sure, it may be "impossible" to resubmit the ballot issue if the proponents did not commence the

---

[2] Here, the I-164 proponents first submitted the proposed ballot issue and draft ballot statements to the Secretary of State on February 23, 2010. The Legislative Services Division completed its review on March 5, the Attorney General completed his review on April 22, and the Secretary of State authorized the proponents to commence signature gathering on April 23.

19

initiative process soon enough or if they delayed in submitting the signed petitions to the county election officials. Under those circumstances, there may not be sufficient time to recirculate new petitions if the signed ones are determined to be void. But that is the reality of election deadlines, and it is the risk of which the proponents are on notice when they start the process late. If time runs out, the fault can hardly be placed on the courts. More to the point, it is not justification for this Court to flout unambiguous statutory directives in a proactive effort to rescue the proponents from their own lack of diligence or inability to obtain signatures and submit petitions in a timely manner.

¶35 Nevertheless, this Court has determined to save I-164 from the doom to which it unquestionably is destined under the statutory scheme. To that end, the Court employs a "cafeteria-style" approach to statutory application, picking and choosing only that statutory language which serves to achieve its goal and rejecting or simply ignoring those provisions which get in the way. I cannot agree with this brand of decision-making. Absent our overruling the statutes based on constitutional authority, we are required to apply them as written. *See* § 1-2-101, MCA. Doing so here, I would hold as follows:

1. If this Court has jurisdiction over the present ballot challenges, that jurisdiction is set forth in § 3-2-202, MCA, and the parties were required to make the certification or stipulation mandated by § 3-2-202(3)(b)(i), MCA.

2. On the merits of MCFA's challenge, the ballot statements contained on the circulated and signed petitions are void.

3. This Court has no authority to place statements on the November ballots that are *different* from the statements on the circulated petitions.

I address these points in turn below.

20

## II. Jurisdiction

## A. Article VII, Section 2

¶36 Jurisdiction is the power and authority of a court to hear and decide the case or matter before it. *State v. Martz*, 2008 MT 382, ¶ 21, 347 Mont. 47, 196 P.3d 1239. This power and authority is conferred on courts only by the Constitution or statutes adopted pursuant to the Constitution. *Martz*, ¶ 21.

¶37 Because jurisdiction involves the fundamental power and authority of a court to determine and hear an issue, a court may address the question of its jurisdiction sua sponte. *See Stanley v. Lemire*, 2006 MT 304, ¶¶ 30-32, 334 Mont. 489, 148 P.3d 643. In fact, courts have an "independent obligation" to determine whether jurisdiction exists, even in the absence of a challenge from any party, and a court which in fact lacks jurisdiction cannot acquire it by consent of the parties. *Stanley*, ¶¶ 31-32.

¶38 Article VII, Section 2 of the Montana Constitution delineates the parameters of this Court's jurisdiction. It states as follows:

> (1) The supreme court has appellate jurisdiction and may issue, hear, and determine writs appropriate thereto. It has original jurisdiction to issue, hear, and determine writs of habeas corpus and such other writs as may be provided by law.
> (2) It has general supervisory control over all other courts.
> (3) It may make rules governing appellate procedure, practice and procedure for all other courts, admission to the bar and the conduct of its members. Rules of procedure shall be subject to disapproval by the legislature in either of the two sessions following promulgation.
> (4) Supreme court process shall extend to all parts of the state.

¶39 Nowhere in Article VII, Section 2, is there authority for this Court to entertain an original proceeding concerning a ballot challenge. Our original jurisdiction is limited.

21

We have original jurisdiction "to issue, hear, and determine writs of habeas corpus and such other writs as may be provided by law." The present proceeding does not involve a writ. Hence, there being no constitutional source for this Court to exercise original jurisdiction over a non-writ proceeding, the statutes granting us such jurisdiction are, necessarily, null and void. *Stanley*, ¶ 52 ("Jurisdiction is conferred on the courts only by the Constitution or statutes adopted *pursuant to the Constitution*." (emphasis added)). We must dismiss these cases sua sponte.

## B. Section 3-2-202(3), MCA

### i. The Law

¶40 The Court nevertheless proceeds on the premise that it has jurisdiction over this proceeding. The statutes governing this Court's jurisdiction are set out in Title 3, chapter 2, part 2, MCA (which is titled "Supreme Court Jurisdiction"). The jurisdictional provisions specific to review of ballot statements are contained in § 3-2-202(3), MCA, which provides as follows:

> (a) The supreme court has original jurisdiction to review the petitioner's ballot statements for initiated measures and the attorney general's ballot statements for referred measures and the attorney general's legal sufficiency determination in an action brought pursuant to 13-27-316.
> (b)(i) In an original proceeding under subsection (3)(a), the petitioner and the attorney general shall certify the absence of factual issues or shall stipulate to and file any factual record necessary to the supreme court's consideration of the petitioner's ballot statements or the attorney general's legal sufficiency determination.
> (ii) If the parties to an original proceeding under subsection (3)(a) fail to make the certification or stipulation required by subsection (3)(b)(i), the supreme court shall refer the proceeding to the district court in the county of residence of the lead petitioner for development of a factual record and an order that addresses the issues provided in 13-27-316(3). . . .

22

¶41 Beginning with subsection (3)(a), this Court "has original jurisdiction to review [1] the petitioner's ballot statements for initiated measures and [2] the attorney general's ballot statements for referred measures and [3] the attorney general's legal sufficiency determination in an action brought pursuant to 13-27-316." This case falls into the third category: a challenge to "the attorney general's legal sufficiency determination in an action brought pursuant to 13-27-316." MCFA's and Harrington's petitions state that they are brought under § 13-27-316, MCA, and the petitions specifically challenge the Attorney General's legal sufficiency determination for I-164.

¶42 Next, there is no dispute that the parties have failed to make the certification or stipulation required by subsection (3)(b)(i)—i.e., they have not certified the absence of factual issues or stipulated to and filed any factual record. The Attorney General asserts that the development of a factual record in district court would be "minimal," and the Court opines that "no issues of fact exist to preclude this Court from" rendering a decision. But that is beside the point. The statute states that the petitioner and the Attorney General "shall certify the absence of factual issues or shall stipulate to and file any factual record necessary to the supreme court's consideration of . . . the attorney general's legal sufficiency determination." Section 3-2-202(3)(b)(i), MCA. The statute does *not* say that the certification or stipulation need be filed only if the Attorney General believes the development of a factual record in district court would be more than "minimal" or if this Court happens to perceive some factual issues. Rather, it says that the certification or stipulation "shall" be filed. Period.

23

¶43 Lastly, when the parties fail to abide by this requirement, as is the case here, this Court's only course of action is statutorily mandated:

> If the parties to an original proceeding under subsection (3)(a) fail to make the certification or stipulation required by subsection (3)(b)(i), *the supreme court shall refer the proceeding to the district court in the county of residence of the lead petitioner for development of a factual record and an order that addresses the issues provided in 13-27-316(3).*

Section 3-2-202(3)(b)(ii), MCA (emphasis added). Honoring this unambiguous statutory mandate, we are required to refer this proceeding to a district court for the purposes stated in § 3-2-303(3)(b)(ii), MCA.

### ii. The Court's Workaround

¶44 As a practical matter, if this proceeding were referred to a district court, there would not be time to resolve MCFA's and Harrington's challenges before the Secretary of State's August 19, 2010 deadline for certifying the candidates and ballot issues for the November 2 ballot. *See* § 13-12-201(1), MCA. To get around this problem, the Court declares that § 3-2-202, MCA, does not apply to these cases.

¶45 The first obvious problem with this approach is that if § 3-2-202, MCA, does not apply to these cases, then we do not have jurisdiction. As noted, § 3-2-202(3), MCA, is the statute which purports to confer "original jurisdiction" on this Court to review ballot statements. No other provision does so. The Court asserts that § 13-27-316(5), MCA, "endows" this Court with "original jurisdiction" to hear challenges to ballot statements, but this is pure fantasy. Section 13-27-316(5), MCA, states:

> An original proceeding in the supreme court under this section is the exclusive remedy for a challenge to the petitioner's ballot statements, as

24

approved by the attorney general, or the attorney general's legal sufficiency determination. A ballot issue may not be invalidated under this section after the secretary of state has certified the ballot under 13-12-201.

It is self-evident that this is not an affirmative "endowment" of jurisdiction. Rather, it is a reference to the "original proceeding" which is established by the grant of "original jurisdiction" in § 3-2-202(3), MCA.

¶46 The second problem with the Court's approach is that it involves a blatant remaking of Harrington's and MCFA's challenges. Again, this Court "has original jurisdiction to review [1] the petitioner's ballot statements for initiated measures and [2] the attorney general's ballot statements for referred measures and [3] the attorney general's legal sufficiency determination in an action brought pursuant to 13-27-316." Section 3-2-202(3)(a), MCA. Focusing on the third category, the question becomes whether Harrington and MCFA challenge the Attorney General's "legal sufficiency" determination and whether their action is brought pursuant to § 13-27-316, MCA. Section 13-27-316(2), MCA, states:

> If the opponents of a ballot issue believe that the petitioner ballot statements approved by the attorney general do not satisfy the requirements of 13-27-312 or believe that the attorney general was incorrect in determining that the petition was legally sufficient, they may, within 10 days of the date of certification to the governor that the completed petition has been officially filed, file an original proceeding in the supreme court challenging the adequacy of the statement or the attorney general's determination and requesting the court to alter the statement or overrule the attorney general's determination concerning the legal sufficiency of the petition. . . .

¶47 The Court concedes that Harrington and MCFA "challenge the ballot statements and Attorney General's legal sufficiency determination for I-164 under § 13-27-316, MCA." In this regard, "legal sufficiency" is defined as follows:

> As used in this part, "legal sufficiency" means that the petition complies with *statutory and constitutional requirements governing submission of the proposed issue to the electors.* Review of the petition for legal sufficiency does not include consideration of the substantive legality of the issue if approved by the voters.

Section 13-27-312(7), MCA (emphasis added). One of the so-called "statutory . . . requirements governing submission of the proposed issue to the electors" is set forth in subsection (4) of the same statute: "The ballot statements must express the true and impartial explanation of the proposed ballot issue in plain, easily understood language and may not be arguments or written so as to create prejudice for or against the issue." Section 13-27-312(4), MCA. The Attorney General is specifically instructed to ensure that this "statutory requirement" is met. *See* § 13-27-312(1), MCA ("[T]he attorney general . . . shall determine whether the ballot statements comply with the requirements of this section."). Here, Harrington and MCFA challenge the Attorney General's determination that I-164's statement of purpose, fiscal statement, and statements of implication are legally sufficient under § 13-27-312(4), MCA. Thus, Harrington and MCFA do, in fact, challenge the Attorney General's determination that the petition complies with the "requirements governing submission of the proposed issue to the electors."

26

¶48 According to the Court, however, Harrington and MCFA raise an improper challenge to the "substantive legality" of I-164, rather than to the Attorney General's determination of legal sufficiency. This is an outright fabrication. Indeed, the Court cannot point to a single sentence in MCFA's petition or Harrington's petition challenging the "substantive legality" of I-164. They do not contend that I-164, if approved by the voters, would constitute a taking of property without just compensation. They do not contend that I-164, if approved by the voters, would violate the Equal Protection Clause. They do not contend that I-164, if approved by the voters, would deprive lenders of property without due process of law. They do not contend that I-164, if approved by the voters, would constitute unconstitutional special legislation. In short, neither MCFA nor Harrington lodges any challenge whatsoever to "the substantive legality of [I-164] if approved by the voters." Section 13-27-312(7), MCA.

¶49 Rather, their petitions clearly and unmistakably challenge the Attorney General's determination that the ballot statements comply with the statutory requirements governing submission of I-164 to the electors. The first sentence of MCFA's Summary of Argument states:

> MCFA contends that I-164's ballot statements do not meet the requirements of section 13-27-312, MCA. As a result, the statements do not meet the statutory requirements for submitting the proposed issue to the electors.

And the first sentence of MCFA's analysis beginning on page 6 of its petition states:

> MCFA initiated this original proceeding pursuant to section 13-27-316, MCA, for the purpose of challenging the adequacy of I-164's ballot statements.

MCFA then goes on, over four pages, to explain why, in its view, the ballot statements do not satisfy § 13-27-312(4), MCA. Finally, at the conclusion of its argument, MCFA asks this Court to

> find that I-164 ballot statements do not meet the requirements of section 13-27-312, MCA, and consequently do not meet the statutory requirements for submitting the proposed issue to the electors, and overrule any determination that the ballot issue is legally sufficient.

Harrington's petition is to the same effect. He states:

> This is an action for judgment arising from the manner in which the Office of the Attorney General of the State of Montana, erroneously prepared and approved statements and made a legal sufficiency determination for a ballot initiative, I-164 . . . .

Harrington further asserts that the statement of purpose, fiscal statement, and statements of implication approved by the Attorney General do not meet the requirements of § 13-27-312(4), MCA—i.e., they do not "express the true and impartial explanation of the proposed ballot issue in plain, easily understood language," and they are "written so as to create prejudice for . . . the issue." Harrington then goes on to propose alternate ballot statements, something he would not have to bother with if he were truly raising a challenge to the "substantive legality" of the measure as the Court claims. *See* § 13-27-316(3)(b), MCA ("*If the proceeding requests modification of ballot statements*, an action brought under this section must state how the petitioner's ballot statements approved by the attorney general do not satisfy the requirements of 13-27-312 and must propose alternate ballot statements that satisfy the requirements of 13-27-312." (emphasis added)).

28

¶50　Even the Court concedes elsewhere in its Order that MCFA and Harrington "invoke this Court's original jurisdiction to challenge the Attorney General's legal sufficiency determination and ballot statements for Initiative No. 164" and that MCFA and Harrington "challenge the ballot statements and Attorney General's legal sufficiency determination for I-164 under § 13-27-316, MCA."  Indeed, if their challenges were to the substantive legality of I-164, and not to the Attorney General's determination under § 13-27-312(7), MCA, that "the petition complies with statutory and constitutional requirements governing submission of the proposed issue to the electors," then there would be no need to rewrite the ballot statements, as the Court does.

¶51　Accordingly, these cases fall squarely within the third category of § 3-2-202(3)(a), MCA.  Yet, the parties have failed to make the certification or stipulation required by § 3-2-202(3)(b)(i), MCA.  Consequently, this Court is required to refer this proceeding to a district court.  The Court's refusal to do so only demonstrates that it is willing to ignore statutory mandates and to distort Petitioners' arguments in order to reach a desired result.

### III.  The Merits of MCFA's Challenge

¶52　I agree with the Court's implicit conclusion that the statement of purpose and statements of implication adopted by the Attorney General do not "express the true and impartial explanation of the proposed ballot issue in plain, easily understood language."  Section 13-27-312(4), MCA.  I reach this conclusion for the reasons argued by MCFA, which I explain below.

29

¶53 Initially, however, I note the Attorney General's threshold argument that MCFA's petition is deficient because MCFA has not proposed alternate ballot statements. This argument is totally without merit. For one thing, alternate ballot statements are required only if the challenger "requests modification of ballot statements" in the action before this Court. Section 13-27-316(3)(b), MCA. And here, MCFA does not request modification of the ballot statements. Rather, MCFA seeks to invalidate the I-164 petitions and I-164 itself on the ground that the ballot statements contained on the petitions were deficient. Thus, MCFA was not required to propose alternate statements.

¶54 Furthermore, if the language of the I-164 petitions is in fact invalid, no proposed alternate language could save them now. The petitions have already been circulated and signed. Those who signed the petitions have already read the deficient statement of purpose and deficient statements of implication. It is too late to recirculate the petitions. *See* §§ 13-12-201(1), 13-27-104, MCA. The Attorney General fails to explain what possible purpose could be served at this point by proposing alternate language. And there is no statutory requirement that an opponent do so under the present circumstances.

¶55 Turning then to the merits of the issue, the fundamental problem with the language of the petitions is quite apparent; and it is perplexing, therefore, that the Attorney General did not recognize and remedy this problem, prior to the petitions' being circulated, in his review of the proposed language and his consultation with parties on both sides of the issue. *See* § 13-27-312(1), (2), MCA. I-164 changes the law with respect to *five* categories of lenders/businesses. Specifically, the initiative applies to:

30

1. So-called "**retail installment lenders**" (the term used in I-164's statement of purpose). Such entities are regulated under Title 31, chapter 1, part 2, MCA (the Montana Retail Installment Sales Act). They include "a person who sells goods or furnishes services to a retail buyer in a written retail installment contract or written retail installment transaction." Section 31-1-202(1)(p), MCA. Sections 3 and 4 of I-164 amend §§ 31-1-203 and -241, MCA, respectively, to limit the permissible finance charge retail installment lenders may charge to 36% per annum.

2. **Pawnbrokers**, who are regulated under Title 31, chapter 1, part 4, MCA. Section 5 of I-164 amends § 31-1-401, MCA, to prohibit pawnbrokers from engaging in certain financial activities (such as cashing or advancing money for a postdated or deferred presentment check in exchange for a fee or finance charge), unless the pawnbroker is licensed as a consumer loan licensee, deferred deposit loan licensee, or title loan licensee. Thus, if I-164 passed, pawnbrokers would be subject to the same 36% interest rate cap to which these other entities are subject.

3. **Deferred deposit (payday) lenders**, who are regulated under Title 31, chapter 1, part 7, MCA (the Montana Deferred Deposit Loan Act). Sections 2 and 6 of I-164 amend §§ 31-1-112 and -722, MCA, respectively, to limit the permissible finance charge deferred deposit lenders may charge to 36% per annum.

4. **Title lenders**, who are regulated under Title 31, chapter 1, part 8, MCA (the Montana Title Loan Act). Sections 2 and 7 of I-164 amend §§ 31-1-112 and -817, MCA, respectively, to limit the permissible finance charge title lenders may charge to 36% per annum.

5. **Consumer loan licensees**, who are regulated under Title 32, chapter 5, MCA (the Montana Consumer Loan Act). Such entities are licensed to offer or extend credit to an individual primarily for personal, family, or household purposes. *See* § 32-5-102(2)(a), MCA. They do not include deferred deposit lenders, title lenders, and certain other regulated lenders such as banks and credit unions. *See* §§ 32-5-102(2)(b), -103(5), MCA. Sections 2 and 8 of I-164 amend §§ 31-1-112 and 32-5-301, MCA, respectively, to limit the permissible finance charge consumer loan licensees may charge to 36% per annum.

¶56 Two of these affected entities are not disclosed to voters in the statement of purpose and the statements of implication adopted by the Attorney General and presented

31

on the face of the petitions (one of which is included as an exhibit at the end of this Dissent). The Attorney General's statement of purpose, fiscal note, and statements of implication inform voters that I-164 does the following (with emphases added):

> Under Montana law, *deferred deposit (payday) lenders* may charge fees equaling one-fourth of the loan, which is the same as an annual interest rate of 300 percent for a 31-day loan or 650 percent for a 14-day loan. *Title lenders* may charge interest equaling one-fourth of the loan, which is the same as an annual interest rate of 300 percent for a 30-day loan. I-164 reduces the interest, fees, and charges that *payday*, *title*, and *retail installment lenders* may charge to an annual interest rate of 36 percent. It prohibits businesses from structuring other transactions to avoid the rate limit.

> I-164 reduces the license and examination fee revenue paid to the State because certain lenders may not renew their licenses.

> [ ] FOR reducing the annual interest, fees, and charges *payday*, *title*, and *retail installment lenders* may charge on loans to 36 percent.

> [ ] AGAINST reducing the annual interest, fees, and charges *payday*, *title*, and *retail installment lenders* may charge on loans to 36 percent.

Deferred deposit (payday) lenders, title lenders, and retail installment lenders are identified. But, as MCFA correctly points out, the statement of purpose and the statements of implication make no mention whatsoever of consumer loan licensees or pawnbrokers, even though these entities are covered and affected by the initiative. Voters are not told that I-164 reduces the interest, fees, and charges that *consumer loan licensees* may charge to an annual interest rate of 36 percent. In this regard, it must be recalled that the statutory scheme clearly distinguishes consumer loans from deferred deposit loans, title loans, and retail installment transactions. *See* §§ 31-1-202(1)(m)-(o), 32-5-102(2), MCA.

32

¶57 The Attorney General is required by law to review a proposed ballot issue for legal sufficiency—i.e., whether the petition "complies with statutory and constitutional requirements governing submission of the proposed issue to the electors." Section 13-27-312(1), (7), MCA. Among other statutory requirements, perhaps the most basic is that the statement of purpose and the statements of implication "must express the true and impartial explanation of the proposed ballot issue in plain, easily understood language." Section 13-27-312(4), MCA. Although the summary preceding an initiative need not contain a complete catalog or index of all provisions within the initiative, the statement of purpose must "provide fair notice of the content of the proposed amendment so that the voter will not be misled as to its purpose, and can cast an intelligent and informed ballot." *Citizens Right to Recall v. McGrath*, 2006 MT 192, ¶ 16, 333 Mont. 153, 142 P.3d 764 (internal quotation marks omitted).

¶58 Here, MCFA contends, and I agree, that the statement of purpose adopted by the Attorney General "not only fails to specifically mention Montana consumer loan licensees, but does not even provide a clue that this licensee is a subject of the initiative." The statement of purpose identifies "payday, title, and retail installment lenders" only. It does not identify any other type of lender, and there is no language that could reasonably be understood to include consumer loan licensees and pawnbrokers within I-164's scope.

¶59 Consequently, the statement of purpose and the statements of implication on the face of the I-164 petitions submitted to voters for signatures are deficient and invalid. They do not "express the true and impartial explanation of the proposed ballot issue in

33

plain, easily understood language." Section 13-27-312(4), MCA. Nor do they provide fair notice of the content of the proposed initiative, so that the voter will not be misled as to its purpose and can make an intelligent decision of whether to sign the petition. *Citizens Right to Recall*, ¶ 16. They are, in fact, misleading in their suggestion that I-164 applies only to "payday, title, and retail installment lenders," when it actually applies to pawnbrokers and consumer loan licensees as well. *Cf. Sawyer Stores v. Mitchell*, 103 Mont. 148, 163-64, 62 P.2d 342, 349-50 (1936).

¶60 The Attorney General argues, first, that there is a "scarce" 100-word limit on a statement of purpose, *see* § 13-27-312(2)(a), as if to suggest that some of the parties who will be affected by a proposed ballot initiative may be omitted or ignored in order to satisfy this word limit. This contention is not even remotely persuasive. A statement of purpose is supposed to be a "true" explanation of the proposed ballot issue. Section 13-27-312(4), MCA. When the Attorney General provides a discrete list of three specific entities to which I-164 specifically applies ("payday, title, and retail installment lenders"), the logical inference is that these entities are the *only* entities covered by the initiative. A person of average intelligence and common sense is not going to assume that there may be some unknown quantity of other entities which are covered by the initiative but which the Attorney General did not bother to mention. The notion that a statement of purpose is "true" when it purports to list the parties affected by the initiative, but actually omits two of those affected parties, is utterly implausible, and the Court properly rejects it.

34

¶61 The Attorney General next argues that the statement of purpose "indicate[s] that other 'businesses' are subject to the initiative as well" because the term "businesses" is used in the last sentence of the statement of purpose, which states: "[I-164] prohibits businesses from structuring other transactions to avoid the rate limit." This contention is truly bizarre for two reasons. First, it is not clear what the term "businesses" even means here. Is it a reference to the "businesses" mentioned in the preceding sentence ("payday, title, and retail installment lenders")? Or is it a reference to all "businesses"? If the latter, then the term "businesses" is misleading because I-164 does not actually impose the 36 percent rate limit on all businesses. To the contrary, there are various businesses which, like consumer loan licensees, deferred deposit loan licensees, and title loan licensees, are considered "regulated lenders," but which are not covered by I-164. These include banks, building and loan associations, savings and loan associations, trust companies, credit unions, credit associations, residential mortgage lender licensees, development corporations, bank holding companies, and mutual or stock insurance companies. Section 31-1-111(1), MCA. These "businesses" are exempt from all limitations on the rate of interest that they may charge and are also exempt from the operation and effect of all usury statutes. *See* § 31-1-112(1), MCA. While Ben Bernanke might have an idea of what the term "businesses" means in the last sentence of the Attorney General's statement of purpose, the average voter presented with an I-164 petition certainly would not.

35

¶62 Second, the Attorney General concedes that one of the reasons he rewrote the proponents' statement of purpose in the first place was because the statement "did not specify the type of loans subject to the limits." The proponents' statement of purpose read (with emphasis added):

> Initiative [164] limits the annual interest, fees and charges *certain lenders, including payday and car title lenders*, may charge on loans to 36 percent because some lenders charge annual rates of more than 400 percent. It extends to all Montanans the same interest rate limit provided to military personnel and their families. It imposes restrictions to prevent lenders from avoiding the rate limits. Loans in violation of the 36 percent annual rate violate the Montana Unfair Trade Practices and Consumer Protection Act.

Yet, the word "businesses" selected by the Attorney General likewise does not specify the type of loans subject to the limits. It is no more informative than the word "certain lenders" selected by the proponents. In fact, it is *less* informative because "certain lenders" is obviously narrower than "businesses." The proponents' proposed statement of purpose at least had the virtue of letting voters know that there were other lenders *besides* "payday and car title lenders" that were affected by I-164. The Attorney General's statement of purpose, on the other hand, refers to "payday, title, and retail installment lenders" and in no way indicates that there are two other regulated lenders that are affected by the initiative.

¶63 Next, the Attorney General argues, in conclusory fashion, that voters would not understand, or might misconstrue, what "consumer loan licensees" are. First of all, however, this is not a valid justification for omitting these entities from the statement of purpose. Consumer loan licensees are one of five specific entities targeted by the

36

initiative, and they therefore should be mentioned in the statement of purpose along with the three targeted entities that are mentioned. Moreover, while the Attorney General criticizes Harrington for not presenting any evidence in support of his arguments, the Attorney General himself presents no evidence that voters would be confused by the term "providers of consumer loans" or that voters understand this term any less than they understand the terms "retail installment lenders," "deferred deposit (payday) lenders," and "title lenders." The Attorney General's argument, rather, is based entirely on sheer conjecture.[3] Finally, and even more to the point, to the extent that voters actually would be confused by the statement of purpose and the statements of implication as written, it is the Attorney General's statutory obligation to reject those statements outright, §§ 13-27-202(4), -312(1), MCA, and to rewrite the language so that voters will not be confused, § 13-27-312(8)(b), MCA. Simply leaving voters in the dark is not a lawful option.

¶64 It is ironic that in rejecting Harrington's assertion that the statement of purpose should name the types of regulated lenders that are *excluded* from I-164's application, the Attorney General suggests that what voters actually "care about" are the entities that *are* affected by I-164, not the ones that *are not* affected by the initiative. Yet, two affected entities (pawnbrokers and consumer loan licensees) are not even mentioned.

---

[3] Not only that, the Attorney General's arguments are internally inconsistent. In one paragraph, the Attorney General states that he left consumer loan licensees out of the statement of purpose because "the application of a 36% annual interest rate to consumer loans is more straightforward." Yet, in the very next paragraph, the Attorney General asserts that "consumer lender" is "a technical term" that voters might misconstrue.

¶65 As a final matter, although not explicitly cited by MCFA, it is important to acknowledge another facet of I-164 that is not mentioned in the Attorney General's statement of purpose. Again, § 13-27-312(4), MCA, read together with *Citizens Right to Recall*, ¶ 16, requires that the statement of purpose and the statements of implication be written so as not to mislead voters as to the initiative's purpose. They must be written with the goal of "fair notice"—i.e., to truthfully inform, so that voters can make an intelligent decision. Unfortunately, as with I-143, it appears that I-164 is yet another "carefully crafted" initiative to put out of business certain lawfully operating businesses which are licensed and regulated by the State. *See Kafka v. Montana Dept. of FWP,* 2008 MT 460, ¶¶ 114-116, 348 Mont. 80, 201 P.3d 8 (Nelson, Rice, & Swandal, JJ., dissenting). With I-143, it was alternative livestock ranchers (game farmers). With I-164, it is certain types of regulated lenders (payday and title lenders in particular). Through the simple expedient of statutorily reducing the price for which the businessperson can sell his or her product or service—here the interest rate such lenders may charge—the public can, without paying just compensation for the taking (*see Kafka,* ¶¶ 54, 64, 83, 94 (Opinion of the Court)), simply render a business unprofitable.[4]

---

[4] It is unlikely, also, that most voters appreciate that payday and title lenders exist, if at all, because most people with lower incomes—whose only "asset" is their car or minimum-wage paycheck—have no legitimate source of reasonably priced, short-term credit when there are more bills than money at the end of the month or when presented with an unexpected financial emergency. They borrow at exorbitant rates of interest because there is no other alternative. I doubt, too, that most voters understand that other "regulated lenders," including banks, building and loan associations, savings and loan associations, trust companies, credit unions, credit associations, residential mortgage lender licensees, development corporations, bank holding companies, and mutual or stock

¶66   For the foregoing reasons, the language of the I-164 petitions is invalid.  Because we cannot go back and "fix" that language, *see* § 13-27-316(3)(c)(ii), MCA, as the petitions have already been presented to and signed by registered voters, the legally correct course of action is to grant MCFA's requested remedy of declaring the petitions void and ordering that I-164 may not appear on the ballot, *see* § 13-27-316(3)(c)(iii), MCA.

## IV.  The Court's New Ballot Statements

¶67   As noted at the outset, this Court has no authority to place statements on the November ballots that are *different* from the statements on the circulated petitions. Granted, this Court has been given authority to rewrite the ballot statements.[5]  *See* § 13-27-316(3)(c)(ii), MCA ("If the court decides that the ballot statements do not meet the requirements of 13-27-312, it may . . . certify to the secretary of state a statement that the court determines will meet the requirements of 13-27-312.").  But "[a] statement . . . certified by the court must be placed *on the petition for circulation* and on the official ballot."  Section 13-27-316(3)(c)(ii), MCA (emphasis added).  Moreover, "[i]f . . . the

---

insurance companies (*see* § 31-1-111(1), MCA)—some of the same folks that lapped up billions in taxpayer-funded bailouts and bonuses—are exempt from all limitations on the rate of interest that they may charge and are exempt from the operation and effect of all usury statutes (*see* § 31-1-112(1), MCA).

[5] As an aside, I find it untenable that this Court possesses such authority.  This Court is, or at least should be, in the business of judging conflicts and disputes over language.  It should not be in the business of rewriting disputed language so that the favored party—here, the Attorney General—wins the dispute.  That the statute even permits such a perverse result violates the most fundamental principles of fairness and impartiality that presumably govern all courts and judges.

supreme court revises the petition form or ballot statements, any petitions signed prior to the revision are void." Section 13-27-316(4), MCA.

¶68 Even as a purely intuitive matter, it seems patently obvious that the statement of purpose, fiscal statement, and statements of implication contained on the petitions circulated to voters *must* be the *same* (at least in substance) as the statement of purpose, fiscal statement, and statements of implication on the ballot provided at the election. Circulating petitions that say one thing and then providing election ballots that say something else undermines the initiative process and misleads the voters. Indeed, it is bait-and-switch fraud and akin to obtaining illegal petition signatures. *See* § 13-27-317, MCA (requiring the ballot issue to be decertified under such circumstances). This is why when this Court revises the petition form or ballot statements, "any petitions signed prior to the revision are void." Section 13-27-316(4), MCA. And without valid petitions, the ballot issue may not appear on the ballot. *See* §§ 13-27-307, -308, MCA; *see also e.g.* § 13-27-316(3)(c)(iii), MCA.

¶69 That this Court would so blatantly disregard the law so that a ballot measure can appear on the ballot, notwithstanding the fact that the petitions upon which the measure is premised are void, should be of grave concern to the very people the Court purports to be protecting: the voters. In this connection, there is an undercurrent in the Attorney General's arguments and in the Court's decision in these cases that invalidating I-164 would disenfranchise voters. This proposition is utterly unavailing. Those who signed the petitions were not properly advised of I-164's purpose and the implications of a vote

40

for or against the initiative. At this point in time, no one has "voted" on I-164, and no one is being "disenfranchised"—i.e., deprived of the right to vote. *See Black's Law Dictionary* 480 (Bryan A. Garner ed., 7th ed., West 1999). Indeed, if this sort of argument had any merit, we could never declare an initiative invalid, for to do so would "disenfranchise" voters. That, of course, is nonsense, since we do, on occasion, declare initiatives which violate the law or the constitution invalid, both before and after voters have voted. *See e.g. State ex rel. Montana Citizens v. Waltermire*, 227 Mont. 85, 738 P.2d 1255 (1987); *Marshall v. State ex rel. Cooney*, 1999 MT 33, 293 Mont. 274, 975 P.2d 325; *Montanans For Justice v. State ex rel. McGrath*, 2006 MT 277, 334 Mont. 237, 146 P.3d 759; *Citizens Against CI-97 v. State*, 2006 MT 278, 334 Mont. 265, 147 P.3d 174. The lesson from these cases, and others like them, is that no one has the right to vote on a ballot measure that is placed before them in violation of the law or the Constitution. Unfortunately, this is a lesson lost upon the Court here.

## V. Conclusion

¶70 The people of this State, through their elected representatives, adopted a system designed to ensure that ballot measures would not appear on the ballot unless certain prerequisites were satisfied. To be sure, the statutory "scheme"—which is, perhaps, an apt appellation—is far from perfect. In this regard, the Attorney General explains that the Legislature revised the initiative process in 2007 in order to avoid a repeat of the "electoral confusion" and "crisis of direct democracy" that surrounded three ballot issues in 2006. *See generally* Laws of Montana, 2007, ch. 481; *Stop Over Spending Montana*

41

*v. State*, 2006 MT 178, 333 Mont. 42, 139 P.3d 788; *Montanans For Justice v. State ex rel. McGrath*, 2006 MT 277, 334 Mont. 237, 146 P.3d 759. Unfortunately, however, as the present challenges to I-164 demonstrate, problems still remain—not the least of which is the fact that challenges to petitions are brought *after* the petitions have been circulated and signed, not to mention the fact that this Court has been granted "original jurisdiction" which the Montana Constitution does not authorize. Moreover, we are once again faced with a challenge to a ballot initiative on an extremely tight timeline, and the parties have failed to comply with the most basic requirements adopted by the Legislature: certify the absence of factual issues, or stipulate to and file any factual record necessary to our decision. To the extent these circumstances have created another "crisis," blame for it plainly lies with lawmakers and the patent failure of the parties to comply with the statutes.

¶71 The entire scheme should probably be scrapped, and the Legislature should simply start over from scratch with a clear statutory framework that (a) is practical and can be understood; (b) allows sufficient time for review by the designated state officials, revisions to the extent necessary, and review of the inevitable ballot challenges by this Court; and (c) guarantees transparency and truth in the initiative and ballot process. In the meantime, however, it is not this Court's prerogative to take on the role of pseudo-legislators and manipulate clear statutory mandates in order to achieve some presumed greater good. It is the Legislature's constitutional role to enact the statutes, and it is this

Court's constitutional role to apply them in a forthright manner. The only "crisis of direct democracy" in the present case is this Court's inability to simply follow the law.

¶72 I am no more a fan of lending institutions that gouge consumers, especially those with lower incomes, than I am of people who charge for the "sport" of shooting defenseless penned animals—indeed, the two compare favorably. However, both the blackletter law and our caselaw require that voters be truthfully informed; that the purposes driving a citizens' initiative, as well as the implications of the initiative, be transparent; and that voters not be misled into voting for the wolf of a facially well-intentioned initiative cloaked in the sheep's clothing of misleading statements of purpose and implication.

¶73 As for the goals of I-164's proponents, since there is, apparently, such a public hullabaloo over the interest rates that payday lenders and title lenders charge, the public should simply demand that its representatives in the Legislature step up to the plate in the next session, do the job which that body has *always* had the power to do, and actually regulate the interest rates of payday, title, and other "regulated" lenders in the interests of consumers. The demise of I-164 certainly would not prevent the Legislature from accomplishing this objective itself.

¶74 Lastly, as to the Concurrence, while it is always easier to shoot the messenger, this Dissent's analysis stands unrefuted.

¶75 I would hold that this Court does not have jurisdiction to entertain Harrington's and MCFA's petitions challenging the I-164 ballot statements. Furthermore, even if we

43

did have jurisdiction under § 3-2-202(3)(a), MCA, we would be required to refer this proceeding to a district court pursuant to § 3-2-202(3)(b)(ii), MCA. Alternatively, on the merits of MCFA's challenge, I conclude that the Attorney General's legal sufficiency determination is incorrect and that I-164 does not comply with statutory requirements. As a result, the petitions are void, and I-164 may not appear on the ballot. *See* § 13-27-316(3)(c)(iii), MCA. Finally, the Court's decision to rewrite the statements for the November ballot, despite the fact that the underlying petitions are void, is without authority and legally untenable.

¶76    I dissent.

/S/ JAMES C. NELSON

# EXHIBIT: I-164 Petition (3 pages)

### PETITION TO PLACE INITIATIVE NO. 164 ON THE ELECTION BALLOT

If 5% of the voters in each of 34 legislative representative districts sign this petition and the total number of voters signing this petition is 24,337, this initiative will appear on the next general election ballot. If a majority of voters vote for this initiative at that election, it will become law.

We, the undersigned Montana voters, propose that the secretary of state place the following initiative on the November 2, 2010, general election ballot:

---

**Statement of Purpose**

Under Montana law, deferred deposit (payday) lenders may charge fees equaling one-fourth of the loan, which is the same as an annual interest rate of 300 percent for a 31-day loan or 650 percent for a 14-day loan. Title lenders may charge interest equaling one-fourth of the loan, which is the same as an annual interest rate of 300 percent for a 30-day loan. I-164 reduces the interest, fees, and charges that payday, title, and retail installment lenders may charge to an annual interest rate of 36 percent. It prohibits businesses from structuring other transactions to avoid the rate limit.

**Fiscal Statement**

I-164 reduces the license and examination fee revenue paid to the State because certain lenders may not renew their licenses.

---

[] **FOR** reducing the annual interest, fees, and charges payday, title, and retail installment lenders may charge on loans to 36 percent.
[] **AGAINST** reducing the annual interest, fees, and charges payday, title, and retail installment lenders may charge on loans to 36 percent.

Voters are urged to read the complete text of the initiative, which is attached to this sheet. A signature on this petition is only to put the initiative on the ballot and does not necessarily mean the signer agrees with the initiative.

### WARNING

A person who purposefully signs a name other than the person's own to this petition, who signs more than once for the same issue at one election, or who signs when not a legally registered Montana voter is subject to a $500 fine, 6 months in jail, or both. Each person is required to sign the person's name and list the person's address or telephone number in substantially the same manner as on the person's voter registration card or the signature will not be counted. In place of a residence address, the signer may provide the signer's post-office address or the signer's home telephone number.

| | Signature | Date Signed | Residence Address or Post-Office Address or Home Telephone Number | Printed Last Name and First and Middle Initials | Signature Gatherer Initials | For County Election Office Use Only | |
|---|---|---|---|---|---|---|---|
| | | | | | | Legis. Rep. Dist. Number | Reserved |
| 1. | | | | | | | |
| 2. | | | | | | | |
| 3. | | | | | | | |
| 4. | | | | | | | |
| 5. | | | | | | | |
| 6. | | | | | | | |
| 7. | | | | | | | |
| 8. | | | | | | | |
| 9. | | | | | | | |
| 10. | | | | | | | |

**INSTRUCTIONS TO SIGNATURE GATHERERS:** Please (1) collect voters' signatures from only one county per sheet; (2) always have a copy of the complete text of the measure attached to this sheet; (3) sign, notarize and attach an affidavit of signature gatherer to the signed petitions. Up to 25 petitions, from the same county, can be attached to one affidavit; and (4) please return this petition, even if not completely full, not later than June 11, 2010 to: Cap The Rate, P.O. Box 5800, Missoula, MT 59806. If you choose to submit the petition directly to the county elections office, please also mail a copy to the address above.

**PETITION #**                     **COUNTY**_____

BE IT ENACTED BY THE PEOPLE OF THE STATE OF MONTANA:

NEW SECTION. **Section 1. Findings.** The people of Montana find that some lenders are charging Montanans over 400% interest annually, that excessive interest rates can lead Montana families into a debt trap of repeat borrowing, that the United States congress has enacted laws capping interest rates on loans to military families at 36% annually, and that responsible small loans are available at interest rates of 36% annually or less.

**Section 2.** Section 31-1-112, MCA, is amended to read:

"**31-1-112. Interest rate limitation exemption -- regulated lenders -- merchant finance.** (1) A regulated lender, except for a deferred deposit loan licensee, title loan licensee, or consumer loan licensee, is exempt from all limitations on the rate of interest that it may charge and is exempt from the operation and effect of all usury statutes.

(2)　　　A finance operation that finances transactions between merchants, as defined in 30-2-104, is also exempt from usury limits."

**Section 3.** Section 31-1-203, MCA, is amended to read:

"**31-1-203. Penalties.** (1) Any person who knowingly violates a provision of this part or engages in the business of a sales finance company in this state without a license as provided in this part is guilty of a misdemeanor and upon conviction shall be punished by a fine of not more than $500 or by imprisonment for not more than 6 months, or both.

(2)　　　Any person violating 31-1-231 through 31-1-243, except as the result of an accidental and bona fide error of computation, shall be barred from recovery of any finance, delinquency, or collection charge on the contract. In addition to other penalties provided by law, a violation of subsection (3) and a contract made in violation of the finance charge limitations imposed by 31-1-241 is a violation of title 30, chapter 14, part 1.

(3)　　　A person may not engage in any device or subterfuge intended to evade the requirements of this chapter including assisting a borrower to obtain a loan at a rate of interest prohibited by Montana law, making loans disguised as personal property sales and leaseback transactions, or disguising loan proceeds as cash rebates for the pretextual installment sale of goods or services.

**Section 4.** Section 31-1-241, MCA, is amended to read:

"**31-1-241. Finance charge limitation.** (1) ~~Notwithstanding the provisions of any other law, the~~ The finance charge included in a retail installment contract must be at a rate agreed upon by the retail seller and the buyer, but the finance charge may not exceed 36% per annum.

(2)　　　~~Notwithstanding the provisions of any other law, the~~ The finance charge included in a retail charge account agreement must be at a rate agreed upon by the retail seller and the buyer, but the finance charge may not exceed 36% per annum.

(3)　　　The finance charge must be computed from month to month (which need not be a calendar month) or over another regular billing cycle period by using either:

(a)　　　the average daily balance in the account in the billing cycle period; or

(b)　　　the ending balance of the account as of the last day of the billing cycle period less the amount of total purchases charged to the account during that billing cycle.

(4)　　　A seller may change the terms of a revolving charge account whether or not the change is authorized by prior agreement. The seller shall give the buyer written notice of any change in the billing cycle prior to the effective date of the change.

(5)　　　If the retail seller increases the finance charge on a retail charge account agreement, then the increased rate may only be applied to the balance consisting of purchases on other charges incurred on or after the effective date of the increase.

(6)　　　For purposes of determining the balance to which the increased rate applies, all payments may be considered to be applied to the balance existing prior to the change in rate until that balance is paid in full.

(7)　　　If the finance charge determined pursuant to subsection (3) for a monthly period is less than 50 cents, a maximum finance charge not in excess of 50 cents may be charged and collected for the period."

**Section 5.** Section 31-1-401, MCA, is amended to read:

"**31-1-401. Interest pawnbrokers may receive -- civil enforcement -- prohibited activities.** (1) A person may not carry on the business of pawnbroker or junk dealer by receiving goods pawned or in pledge for loans at any rate of interest above 10% a year without first obtaining a license. A pawnbroker or junk dealer or the pawnbroker's or junk dealer's employees or agents may not charge a fee of more than 25% of the amount of the loan for a 30-day period. The fee for extending a pawn agreement for 30 days may not exceed 25% of the amount of the loan. For purposes of this section, a fee includes all costs or fees charged, including but not limited to interest, commission, discount, storage, care of property, and purchase option.

(2)　　　The taking, receiving, reserving, or charging of a fee greater than that allowed under subsection (1) is considered a forfeiture of a sum double the amount of the fee for storage or caring that was agreed to be paid.

(3)　　　(a) When a rate or charge greater than that provided for in subsection (1) has been paid, the person by whom it has been paid may recover from the pawnbroker or junk dealer reasonable attorney fees and an amount double the amount of the fee paid.

(b)　　　An action under this ~~section~~ subsection (3) must be brought within 2 years after the payment of the fee. Before a suit may be brought, the party bringing suit shall make written demand for return of the fee paid.

(4)　　　Unless licensed as a consumer loan licensee, deferred deposit loan licensee, or title loan licensee, a pawnbroker or junk dealer may not:

(a)　　　cash or advance money for a postdated or deferred presentment check in exchange for a fee or finance charge;

(b)　　　use a check, authorization for electronic access, or other method of access to a deposit account, savings account, or other financial or asset account as a condition of or security for an extension of credit;

(c)　　　receive the title to a motor vehicle for the purpose of a pawn transaction or in pledge for a loan; or

(d)　　　engage in any device or subterfuge intended to evade the requirements of this chapter including assisting a borrower to obtain a loan at a rate of interest prohibited by Montana law, making loans disguised as personal property sales and leaseback transactions, or disguising loan proceeds as cash rebates for the pretextual installment sale of goods or services.

(5)　　　In addition to other penalties provided by law, a violation of subsection (4) is a violation of title 30, chapter 14, part 1."

**Section 6.** Section 31-1-722, MCA, is amended to read:

"**31-1-722. Prohibited and permitted fees -- attorney fees and costs.** (1) A licensee may not charge or receive, directly or indirectly, any interest, fees, or charges except those specifically authorized by this section.

(2) A licensee may not charge a fee for ~~each deferred deposit loan entered into with a consumer that exceeds 25% of the principal amount of the deferred deposit loan that is advanced or, in the case of an electronic transaction, 25% of the principal amount of the deferred deposit loan.~~ making or carrying each deferred deposit loan authorized by this part that exceeds 36% per annum, exclusive of the insufficient funds fees authorized in subsections (3) and (4).

(3) If there are insufficient funds to pay a check on the date of presentment, a licensee may charge a fee, not to exceed $30. Only one fee may be collected pursuant to this subsection with respect to a particular check even if it has been redeposited and returned more than once. A fee charged pursuant to this subsection is a licensee's exclusive charge for late payment. A licensee or any collection agency acting as an agent of a licensee, as a holder in due course of a licensee, or under an agreement with a licensee to collect amounts due or asserted to be due may not collect damages under 27-1-717(3) for an insufficient funds check.

(4) If the loan involves an electronic deduction and there are insufficient funds to deduct on the date on which the payment is due, a licensee may charge a fee, not to exceed $30. Only one fee may be collected pursuant to this subsection with respect to a particular loan even if the licensee has attempted more than once to deduct the amount due from the consumer's account. A fee charged pursuant to this subsection is a licensee's exclusive charge for late payment. A licensee or any collection agency acting as an agent of a licensee, as a holder in due course of a licensee, or under an agreement with a licensee to collect amounts due or asserted to be due may not collect damages under 27-1-717(3) for an electronic deduction for which there are insufficient funds.

(5) If the loan agreement in 31-1-721 requires, reasonable attorney fees and court costs may be awarded to the party in whose favor a final judgment is rendered in any action on a deferred deposit loan entered into pursuant to this part."

**Section 7.** Section 31-1-817, MCA, is amended to read:

"**31-1-817. Interest rates -- fees charged.** (1) The maximum rate of interest ~~that a title lender may contract for and receive~~ for making and carrying any title loan authorized by this part may not exceed: 36% per annum exclusive of the recording costs and service charges provided for in subsections (2) and (3).

~~(a)     25% for each 30-day period for the portion of a loan that does not exceed $2,000;~~

~~(b)     18% for each 30-day period for the portion of a loan exceeding $2,000 but not exceeding $4,000; and~~

~~(c)     10% for each 30-day period, plus fees, on the portion of a loan that exceeds $4,000.~~

(2) Title lenders may charge their actual costs of recording liens on borrowers' certificates of title.

(3) Title lenders may charge a service charge, as provided in 27-1-717, if there are insufficient funds to pay a check on the date of presentment. Title lenders may not collect damages under 27-1-717(3) based upon the presentment of an insufficient funds check."

**Section 8.** Section 32-5-301, MCA, is amended to read:

"**32-5-301. Fees charged to consumers.** (1) A licensee may contract for and receive, interest on any loan of money, ~~interest as provided under 31-1-112.~~ Such interest, including fees and charges incurred in the making of the loan but excluding the fees authorized in subsections (2) and (3), may not exceed 36% per annum.

(2) If provided for in the contract, an additional fee may be charged for any amount past due according to the original terms of the contract, whether by reason of default or extension agreement. The fee charged may be the greater of $15 or 5% of the amount past due, not to exceed $50. The fee charged for any past-due amount may be charged only once. Except as provided in subsection (3), other fees may not be charged for default or extension of the contract by the borrower.

(3) (a) If provided for in the contract, a licensee may grant a deferral at any time. A deferral postpones the scheduled due date of the earliest unpaid installment and all subsequent installments as originally scheduled or as previously deferred for a period equal to the agreed-upon deferral period. The deferral period is that period during which an installment is not scheduled to be paid by reason of the deferral.

(b) A licensee may charge an additional fee for each deferral. The fee charged may be the greater of $15 or 5% of the amount currently due, not to exceed $50.

(c) Other fees may not be charged by the lender for any deferrals granted by the lender.

(4) The licensee may include in the principal amount of any loan:

(a) the actual fees paid a public official or agency of the state for filing, recording, or releasing any instrument securing the loan;

(b) the premium for insurance in lieu of filing or recording any instrument securing the loan to the extent that the premium does not exceed the fees that would otherwise be payable for filing, recording, or releasing any instrument securing the loan;

(c) bona fide fees or charges related to real estate security paid to third parties;

(d) fees or premiums for title examination, title insurance, or similar purposes, including survey;

(e) fees for preparation of a deed, settlement statement, or other documents;

(f) fees for notarizing deeds and other documents;

(g) appraisal fees;

(h) fees for credit reports; and

(i) fees paid to a trustee for release of a trust deed.

(5) (a) Other fees may not be directly or indirectly contracted for or received by any licensee except those specifically authorized by this chapter. A licensee may not divide into separate parts any contract made for the purpose of or with the effect of obtaining fees in excess of those authorized by this chapter. If any amount in excess of the fees permitted by this chapter is charged, contracted for, or received, the licensee shall forfeit to the borrower a sum that is double the amount that is in excess of the fees authorized by this chapter.

(b) This section does not apply to fees for services rendered in connection with a loan after the loan has been consummated and if the borrower's participation in the services is strictly voluntary."

NEW SECTION. **Section 9. Effective Date.** [This act] applies to all transactions governed hereby entered into on or after January 1, 2011.

Justice Jim Rice, dissenting.

¶77 I believe the Court's determination that Harrington has raised only substantive legal issues, and not issues governing submission of the initiative to the voters, is untenable. I agree with Justice Nelson's Dissent in this regard. Dissent, ¶¶ 40-43. The Court's own summary of the arguments, provided in ¶ 6 of the Opinion, demonstrates that the arguments made by the challengers are directed to the initiative's submission and challenge the Attorney General's "legal sufficiency" determination, as that term is defined in § 13-27-312(7), MCA. Thus, § 3-2-202(3), MCA, applies and governs. Under this unique but specific provision, because the parties have failed to make a certification or stipulation regarding factual issues, "the supreme court shall refer the proceeding to the district court . . . for development of a factual record." Section 3-2-202(3)(b)(ii), MCA.

¶78 The good reason for this legislative directive can be seen by today's decision. The Court, by its modification of the ballot language, is deciding what groups will be named on the ballot. This critical task, if undertaken at all, requires the careful selection of few words and should be based upon a solid factual foundation.

¶79 I would remand in accordance with the statute.

/S/ JIM RICE

48